# United States Court of Appeals
*for the*
# Third Circuit

Case No. 19-1842

B.L., a minor, by her father, LAWRENCE LEVY,
and her mother, BETTY LOU LEVY,

*Appellees,*

v.

MAHANOY AREA SCHOOL DISTRICT,

*Appellant.*

Appeal from an Order granting Appellees' Motion for Summary Judgment entered in the United States District Court for the Middle District of Pennsylvania

## BRIEF FOR APPELLANT

Michael I. Levin, Esq.
David W. Brown, Esq.
LEVIN LEGAL GROUP, P.C.
1800 Byberry Road, Suite 1301
Huntingdon Valley, PA 19006
Phone: (215) 938-6378

*Attorneys for Appellant*

## TABLE OF CONTENTS

Table of Authorities ..... iii

I. JURISDICTIONAL STATEMENT ..... 1

II. STATEMENT OF THE ISSUES ..... 2

III. STATEMENT OF THE CASE ..... 4

IV. SUMMARY OF THE ARGUMENT ..... 7

IV. ARGUMENT ..... 9

A. Standard of Review ..... 9

B. The Courts' Decisions in *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, *J.S. v. Blue Mountain Sch. Dist.* and *Layshock v. Hermitage Sch. Dist.*, Do Not Apply To The Removal Of A Cheerleader From The Extracurricular Activity Of Cheerleading For The Balance Of A School Year When: (A) The Cheerleader Was Not Suspended Or Expelled From School; (B) The Cheerleader Agreed To The Rules Of Conduct As A Condition For Her Participation In Cheerleading; (C) The Rules Were Intended To Further The Educational Mission Of The School District; (D) Participation In Extracurricular Activities Are Considered To Be A Privilege To Be Earned; And (E) The Cheerleader Violated The Rules That She Had Agreed Upon. ..... 10

1. Extracurricular Activities ..... 14

2. The Educational and Team-Building Purposes for the Rules of Conduct ..... 20

3. The Degree of Protection for Speech ..... 24

V. CONCLUSION ..... 42

Certificate of Compliance ..... vi

Certificate of Bar Membership ..... vii

Certificate of Service ..... viii

Certificate of Identical Compliance of Briefs ..... ix

Certificate of Anti-Virus Detection Program Use ..... x

# TABLE OF AUTHORITIES

**Cases**

*ACLU v. Mukasey*, 534 F.3d 181, 186 (3d Cir. 2008) .......... 10
*Ambach v. Norwick*, 441 U.S. 68 (1979) .......... 11
*Angstadt v. Midd–West Sch. Dist.*, 377 F.3d 338 (3d Cir.2004) .......... 17, 19
*B.H. ex rel. Hawk v. Easton Area Sch. Dist*., 725 F.3d 293 (3d Cir. 2013) .......... 26, 42
*Bailey v. Truby*, 321 S.E.2d 302 (W.Va. 1984) .......... 19
*Bd. of Regents of Univ. of Wisconsin Sys. v. Southworth*, 529 U.S. 217 (2000) .......... 20
*Beauharnais v. Illinois*, 343 U.S. 250 (1952) .......... 27
*Bethel Sch. Dist. No. 403 v. Fraser*, 478 U.S. 675 (1986) .......... passim
*Billman v. Big Spring Sch. Dist.*, 27 Pa. D.&C. 3d 488 (Cumberland Com. Pl. 1983) .......... 16
*Bonnell v. Lorenzo*, 241 F.3d 800 (6th Cir. 2001) .......... 25
*Borough of Duryea, Pa. v. Guarnieri*, 564 U.S. 379 (2011) .......... 28, 30
*Brandenburg v. Ohio*, 395 U.S. 444 (1969) .......... 27
*C.H. ex rel. Z.H. v. Oliva*, 226 F.3d 198 (3d Cir. 2000) .......... 35
*Chandler v. McMinnville Sch. Dist.*, 978 F.2d 524 (9th Cir. 1992) .......... 14, 24, 26
*Chaplinsky v. State of New Hampshire*, 315 U.S. 568 (1942) .......... 25, 27, 38
*Chapman v. PIAA*, No. 1:14-CV-192, 2014 WL 2770699 (M.D. Pa. Jun. 18, 2014) .......... 19
*City of San Diego v. Roe*, 543 U.S. 77 (2004) .......... 30
*Cohen v. California*, 403 U.S. 15 (1971) .......... passim
*Connick v. Myers*, 461 U.S. 138 (1983) .......... 30
*D.N. v. Penn Harris Madison Sch. Corp.*, No. 3:05-CV-716RM, 2006 WL 2710596 (N.D. Ind. Sept. 18, 2006) .......... 18
*D.O.F. v. Lewisburg Area Sch. Dist. Bd. of Sch. Directors*, 868 A.2d 28 (Pa. Commw. 2004) .......... 16
*Delatorre v. Minnesota State High School League*, 202 F. Supp. 3d 1046 (D. Minn. 2016) .......... 19
*Delisio v. Ellwood City Area Sch. Dist.*, 70 Pa. D.&C. 2d 524 (Lawrence Com. Pl. 1975) .......... 16
*Doninger v. Niehoff*, 514 F. Supp. 2d 199 (D. Conn. 2007), *aff'd* 527 F.3d 41 (2d Cir. 2008) .......... 13, 18, 19, 37
*Engquist v. Oregon Dept. of Agriculture*, 553 U.S. 591 (2008) .......... 28

*Farver v. Bd. of Educ. of Carroll County*, 40 F. Supp. 2d 323 (D. Md. 1999) .......18
*FCC v. Pacifica Foundation*, 438 U.S. 726 (1978) ................................................26
*Felton v. Fayette Sch. Dist.*, 875 F.2d 191 (8th Cir. 1989).....................................18
*First Nat'l Bank of Boston v. Bellotti*, 435 U.S. 765 (1978)..................................31
*Giboney v. Empire Storage & Ice Co.*, 336 U.S. 490 (1949) ................................27
*Grantham v. Trickey*, 21 F.3d 289 (8th Cir. 1994) .................................................40
*Hazelwood School Dist. v. Kuhlmeier*, 484 U.S. 260 (1988) .................................31
*In re Orthopedic Bone Screw Products Liab. Litig.*, 193 F.3d 781 (3d Cir. 1999) .28
*J.S. ex rel. Snyder v. Blue Mountain School Dist.*, 650 F.3d 915 (3d Cir. 2011) ............................................................................................... passim
*Johnson v. Cache Cty. Sch. Dist.*, 323 F. Supp. 3d 1301 (D. Utah 2018) ..............13
*King v. Hempfield Sch. Dist.*, 8 Pa. D.&C. 4th 48 (Lancaster Com. Pl. 1990) .......16
*Kirby v. Loyalsock Twp. Sch. Dist.*, 837 F. Supp. 2d 467 (M.D. Pa. 2011) ...........17
*Knotts v. Oregon Trail Sch. Dist. 46*, No. 3:15-cv-2296-AC, 2017 WL 4861521 (D.Ore. Oct. 26, 2017) .........................................................................26
*Layshock ex rel. Layshock v. Hermitage School Dist.*, 650 F.3d 205 (3d Cir. 2011) ............................................................................................... passim
*Lowery v. Euverard*, 497 F.3d 584 (6th Cir. 2007) ....................................... passim
*Martin v. Parrish*, 805 F.2d 583 (5th Cir. 1986) ............................................ 13, 25
*McGee v. Virginia High School League, Inc.*, 801 F. Supp. 2d 526 (W.D. Va. 2011) ..............................................................................................19
*McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334 (1995) ...................................31
*Melrose, Inc. v. City of Pittsburgh*, 613 F.3d 380 (3d Cir. 2010).............................9
*Miller v. California*, 413 U.S. 15 (1973) ....................................................... 25, 40
*Morse v. Frederick*, 551 U.S. 393 (2007) ....................................................... 32, 42
*NASA v. Nelson*, 562 U.S. ––—, (2011) .................................................................28
*Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569 (1998) ...............................13
*New Jersey v. T.L.O.*, 469 U.S. 325 (1985) ..........................................................33
*Pickering v. Bd. of Ed. of Twp. High Sch. Dist. 205, Will Cty., Ill.*, 391 U.S. 563 (1968)......................................................................................................30
*R.A.V. v. St. Paul*, 505 U.S. 377 (1992)........................................................... 27, 39
*Roth v. United States*, 354 U.S. 476 (1957) ............................................... 27, 38, 39
*Schaill by Kross v. Tippecanoe Cty. Sch. Corp.*, 679 F. Supp. 833 (N.D. Ind. 1988), *aff'd* 864 F.2d 1309 (7th Cir. 1988).....................................................................19

*Scott v. Minnesota State High School League*, No. 16-cv-4148, 2016 WL 7735565 (D. Minn. Dec. 27, 2016) ..........20
*Simon & Schuster, Inc. v. Members of N.Y. State Crime Victims Bd.*, 502 U.S. 105 (1991)..........27
*Speiser v. Randall*, 357 U.S. 513 (1958) ..........34
*Stokey v. N. Canton Sch. Dist.*, No. 5:18-CV-1011, 2018 WL 2234953 (N.D. Ohio May 15, 2018)..........41
*Thomas v. Board of Education, Granville Central School Dist.*, 607 F.2d 1043 (2d Cir. 1979)..........33
*Tinker v. Des Moines Indep. Comm. School Dist.*, 393 U.S. 503 (1969)........ passim
*United States v. Poocha*, 259 F.3d 1077 (9th Cir. 2001)..........26
*United States v. Stevens*, 559 U.S. 460 (2010) ..........27
*Vernonia Sch. Dist. 47J v. Acton*, 515 U.S. 646 (1995) .......... passim
*Virginia Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc.*, 425 U.S. 748 (1976).......... 19, 27, 30
*Waters v. Churchill*, 511 U.S. 661 (1994) ..........28
*Ziegler v. Martin Cty. Sch. Dist.*, 831 F.3d 1309 (11th Cir. 2016)..........13

**Statutes**

24 P.S. §5-510.......... 15, 16, 36
24 P.S. §5-511.......... 15, 16, 28, 36
28 U.S.C. § 1291..........1
28 U.S.C. § 1331..........1
28 U.S.C. § 1343..........1

**Other Authorities**

First Amendment..........1
First Amendment to the U.S. Constitution .......... passim
Fourteenth Amendment .......... 1, 6, 19, 39

**Rules**

Local Rule 28.1..........2, 3

## I. JURISDICTIONAL STATEMENT

The United State District Court for the Middle District of Pennsylvania had subject matter jurisdiction in this matter pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1343(a), as the Plaintiff-Appellees alleged violations of the First Amendment and the Due Process Clause of the Fourteenth Amendment.

This Court has appellate jurisdiction pursuant to 28 U.S.C. § 1291, as the Appellant is appealing a final decision of the district court granting the Appellees' motion for summary judgment.

Appellant timely filed a Notice of Appeal of the district court's March 21, 2019 Order on April 12, 2019. On May 9, 2019, this Court's clerk issued a Briefing and Scheduling Order [Document 003113233621]. On June 14, 2019, all parties filed a Joint Motion for a Procedural Order Amending the Briefing Schedule. On June 17, 2019, the clerk entered a text-only order stating in pertinent part:

> The briefing schedule is hereby modified as follows: Appellant's brief and appendix must be filed and served on or before June 28, 2019. Appellee's brief must be filed and served on or before August 7, 2019. Appellant's reply brief must be filed and served on or before August 28, 2019.

Text-Only Order (Jun. 17, 2019). The Appellant now timely files this brief and the accompanying Joint Appendix.

## II. STATEMENT OF THE ISSUES

1. Whether the courts' decisions in *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, *J.S. v. Blue Mountain Sch. Dist.* and *Layshock v. Hermitage Sch. Dist.*, apply to the removal of a cheerleader from the extracurricular activity of cheerleading for the balance of a school year when: (A) the cheerleader was not suspended or expelled from school; (B) the cheerleader agreed to the rules of conduct as a condition for her participation in cheerleading; (C) the rules were intended to further the educational mission of the school district; (D) participation in extracurricular activities are considered to be a privilege to be earned; and (E) the cheerleader violated the rules that she had agreed upon?

***Suggested answer: No.***

**Pursuant to Local Rule 28.1(a)(1)**, each of the issues on appeal was raised below by Appellants, opposed by Appellees, and ruled upon by the district court. J.A. 18-19 (rejecting argument that exclusion only from extracurricular activities fails to raise constitutional concerns – subpart A); J.A. 13-14 (discussing waiver of rights based on agreeing to cheerleading rules – subparts B, E); J.A. 25 (rejecting issues raised by expert witness, including the educational mission of schools – subpart C); J.A. 15-17 (finding the lack of a constitutional right to participate in cheerleading to be immaterial – subpart D).

**Pursuant to Local Rule 28.1(a)(2)**, the Appellant hereby certifies that there are no related cases or proceedings to this matter other than the underlying decision being appealed. The Appellant further certifies that this case has not previously been before this Court.

## III. STATEMENT OF THE CASE

Plaintiff B.L., a minor, was a member of the Mahanoy Area High School ("MAHS") junior varsity cheerleading squad as a freshman during the 2016-2017 school year. J.A. 34, 472. The coaches for the MAHS cheerleading team – both varsity and junior varsity – that year were Nicole Luchetta-Rump ("Luchetta-Rump") and April Gnall ("Gnall"). J.A. 34, 472. Every May, the cheerleading team holds tryouts for the following school year. In May 2017, B.L. attended the tryouts for the 2017-2018 cheerleading team. J.A. 476. The coaches do not judge the tryouts. Instead, other people are retained to judge tryouts. Because B.L. received a low score on her tryout, she failed to make the varsity squad and was assigned to the junior varsity squad again for her sophomore year. J.A. 216-17.

On or about May 27, 2017, B.L. posted a "Snap" to the Snapchat social media application showing her and a friend holding up their middle fingers. The photo was accompanied by the text: "fuck school fuck softball fuck cheer fuck everything." J.A. 36, 477, 484. B.L. took the photograph, typed in the text, and posted the Snap using her cellular phone. J.A. 477, 528. The photograph was taken at a Mahanoy City convenience store. J.A. 528. B.L. later stated that she created the Snap because she was mad that she had failed to make the varsity cheerleading squad. J.A. 376, 477, 527. B.L. became upset that an incoming freshman made the varsity squad. J.A. 476, 487. The Snap was shared via

Snapchat with approximately 250 of B.L.'s "friends," many of whom were MAHS students, and many that were on the cheerleading squad. J.A. 37, 75-76, 478, 529.

After learning of the Snaps, coaches Gnall and Luchetta-Rump decided to suspend B.L. from the team for one year for violating team rules. J.A. 37, 201, 478. The coaches would not have suspended B.L. if her Snap had not referenced cheerleading. J.A. 196-97, 480. B.L.'s discipline did not include any suspension or expulsion from school or from any classes or courses.

MAHS Cheerleaders are expected to abide by a set of team rules (the "Cheerleading Rules"). J.A. 35, 438-39, 473. The Cheerleading Rules state, inter alia: "Please have respect for your school, coaches, teachers, other cheerleaders and teams. . . . Good sportsmanship will be enforced, this includes foul language and inappropriate gestures." The Cheerleading Rules further state, "There will be no toleration of any negative information regarding cheerleading, cheerleaders, or coaches placed on the internet." J.A. 438-49, 473-74. B.L. and her mother signed a form acknowledging receipt of, and agreeing to abide by, the Cheerleading Rules. J.A. 473, 488, 497. At her deposition, B.L. testified that the Cheerleading Rules are reasonable and that use of the word "fuck" violates the rules when a cheerleader is representing MAHS. J.A. 347-48, 475. The Cheerleading Rules are intended, in part, to teach students to follow rules of society. The Cheerleading

Rules and rules for other extracurricular activities also teach students that certain privileges come with responsibilities. J.A. 193-94, 481.

After B.L. posted the Snaps, several MAHS students – both cheerleaders and non-cheerleaders – approached Coach Luchetta-Rump to express their concerns that the Snaps were inappropriate. Students were visibly upset and voiced their concerns to Luchetta-Rump repeatedly for several days. J.A. 210-11, 480.

On September 25, 2017, B.L., through her parents, filed a Complaint against the Mahanoy Area School District ("MASD"), alleging violations of the First Amendment and the Due Process Clause of the Fourteenth Amendment. J.A. 26, 32-47. On October 5, 2017, Judge A. Richard Caputo issued a preliminary injunction reinstating B.L. to the cheerleading team. J.A. 27. When B.L. returned to the team following the granting of the preliminary injunction, a majority of cheerleaders on the team were upset that she had been permitted to return, and at least eight cheerleaders expressed their disappointment to Coach Luchetta-Rump. J.A. 212-15, 480.

On March 21, 2019, following the close of discovery, Judge Caputo issued the Memorandum and Order granting Plaintiffs' motion for summary judgment on the First Amendment claim. J.A. 3-25. The court awarded B.L. "nominal damages of $1" and required MASD to "expunge any record of its disciplinary action against B.L." (Plaintiffs' counsel intends to file an application for attorneys' fees

and costs pursuant to 42 U.S.C. § 1988.) J.A. 3. MASD now appeals the grant of summary judgment. J.A. 1-2.

## IV. SUMMARY OF THE ARGUMENT

The district court granted summary judgment in favor of the Plaintiff-Appellees on their First Amendment claim by applying the baseline rule of *Tinker v. Des Moines Indep. Comm. School Dist.*, 393 U.S. 503 (1969) that student speech is protected under the First Amendment absent a likelihood of substantial disruption in the school. In doing so, the district court looked to this Court's rulings in two cases decided on the same day – *Layshock ex rel. Layshock v. Hermitage School Dist.*, 650 F.3d 205 (3d Cir. 2011) and *J.S. ex rel. Snyder v. Blue Mountain School Dist.*, 650 F.3d 915 (3d Cir. 2011) – both of which were determined in favor of students who had been suspended from school (and disciplined in other ways) for creating web sites mocking school officials. However, each of those cases are distinguishable because they all involved exclusion from school in the form of a suspension or expulsion. In this case, B.L. was merely suspended from participating in an extracurricular activity. Accordingly, the analysis should be different.

First, when no exclusion from school is involved, schools must be permitted to enforce socially acceptable behavior. Other circuits have held that this is a prime mission of schools and have upheld discipline for students' out-of-school

actions that have violated social norms, including the use of language that is vulgar, lewd, obscene, or plainly offensive, as is the case here. Indeed, even the bellwether case of *Tinker* notes that its rule does not apply to cases involving student deportment.

Although the District Court does not recognize any difference between exclusion from school and exclusion from extracurricular events, Pennsylvania law has long recognized a difference stemming from the two different provisions of the Pennsylvania School Code governing the two areas. Accordingly, participation in extracurricular activities is a privilege, not a right, and courts have repeatedly recognized schools' authority to place conditions on students' participation in such activities. Meanwhile, other courts have recognized the disruption of team cohesion for extracurricular activities constitutes a substantial disruption under *Tinker*. In this case, B.L. caused an uproar both at the time that she posted her offensive Snap, and then again when she was permitted by the court to return to the team.

Secondly, enforcing team rules assists schools in their educational mission of instructing students to follow rules and be good citizens. The student in this case, B.L., violated both her school's rules for proper conduct, as well as the cheerleading team's rules. And the violation came after B.L. and her mother signed a form acknowledging receipt of the cheerleading rules and vowing to obey

them. The U.S. Supreme Court has even held that schools can enforce rules of conduct on students; however, this argument was dismissed out of hand by the district court.

Finally, the court below did not properly analyze the speech at issue in this case and the level of protection afforded to it by the First Amendment, if any. In this case, the student's vulgar message does not deserve the same level of protection as the political statement against the Vietnam War being made in Tinker. In fact, the statement "fuck school fuck softball fuck cheer fuck everything" constitutes "nonspeech" deserving no First Amendment protection whatsoever, as B.L. testified that there was no "message" in the Snap, but merely an expression of her anger at failing to make the varsity cheerleading team and failing to get the softball position that she sought.

## V. ARGUMENT

### A. Standard of Review

The Court exercises plenary review over a district court's grant of summary judgment. *Melrose, Inc. v. City of Pittsburgh*, 613 F.3d 380, 387 (3d Cir. 2010). It "is appropriate only where, drawing all reasonable inferences in favor of the nonmoving party, there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law." *Id.* (alteration in original

and citation omitted). Because this is a First Amendment case, the Court must also "engage in a searching, independent factual review of the full record." *ACLU v. Mukasey*, 534 F.3d 181, 186 (3d Cir. 2008) (citations omitted). However, all parties agree on the facts, disagreeing only on the law as applied by the district court.

### B. The Courts' Decisions in *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, *J.S. v. Blue Mountain Sch. Dist.* and *Layshock v. Hermitage Sch. Dist.*, Do Not Apply To The Removal Of A Cheerleader From The Extracurricular Activity Of Cheerleading For The Balance Of A School Year When: (A) The Cheerleader Was Not Suspended Or Expelled From School; (B) The Cheerleader Agreed To The Rules Of Conduct As A Condition For Her Participation In Cheerleading; (C) The Rules Were Intended To Further The Educational Mission Of The School District; (D) Participation In Extracurricular Activities Are Considered To Be A Privilege To Be Earned; And (E) The Cheerleader Violated The Rules That She Had Agreed Upon.

B.L. (the "Student"), a 10th grade student and member of the junior varsity cheerleading squad for the Mahanoy Jr./Sr. High School (the "School"), posted on social media a picture of herself giving "the finger" that contained the caption, "Fuck school fuck softball fuck cheer fuck everything." J.A. 484. The picture and profane caption were sent to about 250 people, including members of the cheerleading squad. J.A. 37, 529. The Student's conduct was in violation of the rules that she and her mother agreed upon. J.A. 488, 497. As a result, the Student

was removed by the coaches from the cheerleading squad for the balance of the school year.

The Student's parents appealed to the School Board, which supported the decision of the coaches. Suit was filed in the United States District Court for the Middle District of Pennsylvania, and the case was assigned to the Honorable Judge A. Richard Caputo. Judge Caputo granted a motion for a preliminary injunction reinstating the Student to the cheerleading squad. Ultimately, Judge Caputo granted summary judgment for the Student, relying principally upon the courts' decisions in *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503 (1969); *J.S. v. Blue Mountain Sch. Dist.*, 650 F.3d 915 (3d Cir. 2011); and *Layshock v. Hermitage Sch. Dist.*, 650 F.3d 205 (3d Cir. 2011). For the reasons that follow, it is submitted that these cases are distinguishable and should not be applied to the facts in this case. Reliance on those cases does not properly consider the nature of the Student's conduct or the context of extracurricular activities.

Perhaps the judicial passage that best supports the School District's position is the following:

> The role and purpose of the American public school system were well described by two historians, who stated: "[P]ublic education must prepare pupils for citizenship in the Republic . . . . It must inculcate the habits and manners of civility as values in themselves conducive to happiness and as indispensable to the practice of self-government in the community and the nation." C. Beard & M. Beard, NEW BASIC HISTORY OF THE UNITED STATES 228 (1968). In *Ambach v. Norwick*, 441 U.S. 68, 76-77, 99 S.Ct. 1589, 1594, 60 L.Ed.2d 49 (1979), we

> echoed the essence of this statement of the objectives of public education as the "inculcat[ion of] fundamental values necessary to the maintenance of a democratic political system."
>
> These fundamental values of "habits and manners of civility" essential to a democratic society must, of course, include tolerance of divergent political and religious views, even when the views expressed may be unpopular. But these "fundamental values" must also take into account consideration of the sensibilities of others, and, in the case of a school, the sensibilities of fellow students. ***The undoubted freedom to advocate unpopular and controversial views in schools and classrooms must be balanced against the society's countervailing interest in teaching students the boundaries of socially appropriate behavior***. Even the most heated political discourse in a democratic society requires consideration for the personal sensibilities of the other participants and audiences.

*Bethel Sch. Dist. No. 403 v. Fraser*, 478 U.S. 675, 681 (1986) (emphasis added).

Although the student in *Bethel* was engaged in conduct at school, the language of the Supreme Court indicated that its reach could be beyond the schoolhouse gate. The Supreme Court said:

> ***Surely it is a highly appropriate function of public school education to prohibit the use of vulgar and offensive terms in public discourse.*** Indeed, the "fundamental values necessary to the maintenance of a democratic political system" disfavor the use of terms of debate highly offensive or highly threatening to others. Nothing in the Constitution prohibits the states from insisting that certain modes of expression are inappropriate and subject to sanctions. The inculcation of these values is truly the "work of the schools."

*Fraser* at 683 (emphasis added).

By its express terms, the Supreme Court's phrase quoted above applies to "public discourse," and is not limited only to speech or discourse that takes place

in school. This language was quoted with approval by courts not only when the conduct occurred in school – *see Vernonia Sch. Dist. 47J v. Acton,* 515 U.S. 646 (1995) – but in the following cases, some of which apply the concept to a broader scope of authority. *See Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 584 (1998); *Ziegler v. Martin Cty. Sch. Dist*., 831 F.3d 1309, 1327 (11th Cir. 2016); *Johnson v. Cache Cty. Sch. Dist*., 323 F. Supp. 3d 1301, 1317 (D. Utah 2018).

Although your Honorable Court ruled in *J.S. v. Blue Mountain Sch. Dist*, *supra* and *Layshock v. Hermitage Sch. District, supra,* that the reach of school districts did not extend beyond the school day when the sanction imposed was the denial of education, it is submitted that when it comes to the denial of continued participation in a voluntary extracurricular activity, school districts should be encouraged to teach and enforce socially appropriate behavior. *See Doninger v. Niehoff*, 514 F. Supp. 2d 199, 213-14 (D. Conn. 2007), *aff'd* 527 F.3d 41 (2d Cir. 2008) (denying preliminary injunction for student who was prohibited from running for senior class officer due to a post on social media); *Lowery v. Euverard*, 497 F.3d 584 (6th Cir. 2007) (holding that First Amendment rights were not violated when player was removed from football team for circulating an insubordinate petition); *Johnson,* 323 F. Supp. 3d at 1321 (holding that First Amendment rights were not violated for a student who was dismissed from cheerleading squad for improper social media usage). It is submitted that the lower

court's decision in this case is in conflict with principles expressed by the Supreme Court's decisions in *Vernonia* and *Frasier*. *See also Chandler v. McMinnville Sch. Dist.*, 978 F.2d 524, 529 (9th Cir. 1992) (noting that school officials may suppress speech that is vulgar, lewd, obscene, or plainly offensive without a showing that such speech occurred during a school-sponsored event or threatened to "substantially interfere with [the school's] work.") Indeed, the lower court's decision extends the *Tinker* decision beyond the holding of the Supreme Court in that case. For these reasons, the School District respectfully requests that the lower court's decision be reversed and that judgment be entered in favor of the School District.

**1. Extracurricular Activities.**

Extracurricular activities and participation in extracurricular activities are fundamentally different than attendance in school and the rights associated with attendance at school. The removal from a sports team is fundamentally different than a suspension or expulsion from school. The Supreme Court flatly stated that by voluntarily choosing to participate in extracurricular activities, students agree to accept certain limitations on rights that they may have otherwise.

> By choosing to "go out for the team," they voluntarily subject themselves to a degree of regulation even higher than that imposed on students generally. In Vernonia's public schools, they must submit to a preseason physical exam (James testified that his included the giving of a urine sample), they must acquire adequate insurance coverage or sign an insurance waiver, maintain a minimum grade point average,

> ***and comply with any rules of conduct***, dress, training hours and related matters as may be established for each sport by the head coach and athletic director with the principal's approval. ***Somewhat like adults who choose to participate in a "closely regulated industry," students who voluntarily participate in school athletics have reason to expect intrusions upon normal rights and privileges***, including privacy.

*Vernonia*, 515 U.S. at 657 (emphasis added; internal citations and quotations omitted).

Pennsylvania's General Assembly recognized the difference between the right to attend school and the privilege of participating in extracurricular activities by enacting different statutory rules governing the two. The legal authority to control school is granted to school boards in Section 510 of the School Code, 24 P.S. §5-510, whereas the legal authority to control extracurricular activities is granted to school boards in Section 511 of the School Code, 24 P.S. §5-511. With respect to school, the power to control student conduct is expressly limited to the time that students are in school, going to or from school, or under the supervision of school. Section 510 of the School Code provides, in relevant part:

> The board of school directors in any school district may adopt and enforce such reasonable rules and regulations as it may deem necessary and proper, regarding . . . the conduct and deportment of all pupils attending the public schools in the district, ***during such time as they are under the supervision of the board of school directors and teachers, including the time necessarily spent in coming to and returning from school.***

24 P.S. § 5-510 (emphasis added). No such limitation in terms of the time during which school boards may control extracurricular activities exists. Section 511 of the School Code provides, in pertinent part:

> a) The board of school directors in every school district shall prescribe, adopt, and enforce such reasonable rules and regulations as it may deem proper, regarding (1) the management, supervision, control, or prohibition of exercises, athletics, or games of any kind, school publications, debating, forensic, dramatic, musical, and other activities related to the school program, including raising and disbursing funds for any or all of such purposes and for scholarships, and (2) the organization, management, supervision, control, financing, or prohibition of organizations, clubs, societies and groups of the members of any class or school, and may provide for the suspension, dismissal, or other reasonable penalty in the case of any appointee, professional or other employe, or pupil who violates any of such rules or regulations.

24 P.S. § 5-511.

The difference between suspending or expelling students from school under Section 510 of the School Code and removing students from an extracurricular activity under Section 511 has long been recognized by the courts in Pennsylvania. *Compare D.O.F. v. Lewisburg Area Sch. Dist. Bd. of Sch. Directors*, 868 A.2d 28, 30 (Pa. Commw. 2004) with *Billman v. Big Spring Sch. Dist.*, 27 Pa. D.&C. 3d 488 (Cumberland Com. Pl. 1983); *King v. Hempfield Sch. Dist.*, 8 Pa. D.&C. 4th 48 (Lancaster Com. Pl. 1990); *Delisio v. Ellwood City Area Sch. Dist.*, 70 Pa. D.&C. 2d 524, 528 (Lawrence Com. Pl. 1975) ("There are circumstances under which

school supervision off the school premises after hours is indicated and proper, and there are circumstances under which it is improper.")

Consistent with the distinction in law between regulating school and regulating extracurricular activities, the courts have made it clear that although there is a constitutionally protected property right to attend school, there is no such constitutionally protected property right to participate in extracurricular activities.

> "Protected interests in property are 'normally not created by the Constitution. Rather, they are created and their dimensions are defined' by an independent source such as state statutes or rules entitling the citizen to certain benefits." [Citation omitted]. Under Pennsylvania law, a student has a "legitimate claim of entitlement to a public education." *Id.* However, Plaintiff has not alleged or presented evidence that Defendants deprived her of a public education. Instead, Plaintiff is asserting that Defendants deprived her of a protected property interest in participating in extracurricular activities.
>
> * * *
>
> The Supreme Court has not addressed the issue of whether a public school student has a protected property interest in participating in extracurricular school activities. However, many courts have held that a public school student does not have a protected property interest in extracurricular activities. *See Lowery v. Euverard*, 497 F.3d 584, 588 (6th Cir.2007) ("It is well-established that students do not have a general constitutional right to participate in extracurricular athletics."); *Angstadt v. Midd–West Sch. Dist.*, 377 F.3d 338, 344 (3d Cir.2004) (affirming district court ruling that public school student did not have a protected property interest in extracurricular activities).

*Kirby v. Loyalsock Twp. Sch. Dist.*, 837 F. Supp. 2d 467, 477 (M.D. Pa. 2011).

Not being a right, participation in extracurricular activities is largely recognized as a privilege.

> [N]either *Tinker* nor *Fraser* involved participation in voluntary, extracurricular activities, and in other contexts, ***the Supreme Court and other courts have been willing to accord great discretion to school officials in deciding whether students are eligible to participate in extracurricular activities.*** Indeed, as one treatise has noted, "an overwhelming majority of both federal and state courts have held that participation in extracurricular activities . . . is a privilege, not a right. In fact, one of the longest string cites one is likely to encounter this side of a law review article supports the proposition that extracurricular activity is not a constitutionally protected property interest." Charles J. Russo & Ralph D. Mawdsley, EDUCATION LAW § 4.05[1], at 4-20 to 4-21 (internal citations and quotation marks omitted); *see also Felton v. Fayette Sch. Dist.*, 875 F.2d 191 (8th Cir. 1989) (granting summary judgment for the school on the ground that the school's "good citizenship" rule furthered a legitimate pedagogical purpose and so was a permissible basis for a student's expulsion); *Farver v. Bd. of Educ. of Carroll County*, 40 F. Supp. 2d 323 (D. Md. 1999) (denying preliminary injunction against students' suspension from extracurricular activities as a result of violations of the school's policy prohibiting actual or constructive possession of alcohol*); D.N. v. Penn Harris Madison Sch. Corp.*, No. 3:05-CV-716RM, 2006 WL 2710596 (N.D. Ind. Sept. 18, 2006) (dismissing for failure to state a claim a suit brought by a student challenging his suspension from participation in extracurricular activities following a violation of the school's code of conduct).
>
> * * *
>
> As a student leader, Avery had a particular responsibility under the school handbook and school policy to demonstrate qualities of good citizenship at all times. Ms. Niehoff testified that she defined good citizenship as respect for others, behaving appropriately and as a good role model, working to initiate community connections, and promoting positive interactions and conflict resolution. Avery and Ms. Doninger also signed the school handbook, which included language regarding the social and civic expectations of students, at the beginning of the school year.

*Doninger*, 514 F. Supp. 2d at 213-14 (emphasis added). Another court said:

> Without minimizing the important benefits to be gleaned from high school sports, the school correctly observed in its program and policy statement, that participation in its athletic programs is a privilege and not a right.
>
> A number of circuits have determined specifically that the privilege of participating in interscholastic athletics falls outside the protection of the Due Process Clause of the Fourteenth Amendment of the United States Constitution.

*Schaill by Kross v. Tippecanoe Cty. Sch. Corp.*, 679 F. Supp. 833, 853 (N.D. Ind. 1988), *aff'd* 864 F.2d 1309 (7th Cir. 1988).

Against the background that students have no constitutional right to participate in extracurricular activities, the courts have upheld a myriad of rules imposed on students as conditions for their participation in the activity, even in the face of constitutional challenges. *See, e.g., Vernonia, supra* (upholding random drug and alcohol testing as a condition for participation in extracurricular sports); *Angstadt, supra* (upholding attendance rules); *Doninger, supra* (upholding requirement of good citizenship to run for class officer position); *Bailey v. Truby*, 321 S.E.2d 302 (W.Va. 1984) (upholding academic and attendance conditions); *Chapman v. PIAA*, No. 1:14-CV-192, 2014 WL 2770699 (M.D. Pa. Jun. 18, 2014) (upholding enrollment conditions for participation); *Delatorre v. Minnesota State High School League*, 202 F. Supp. 3d 1046 (D. Minn. 2016) (upholding transfer conditions); *McGee v. Virginia High School League, Inc.*, 801 F. Supp. 2d 526 (W.D. Va. 2011) (upholding transfer conditions on eligibility); *Scott v. Minnesota*

*State High School League*, No. 16-cv-4148, 2016 WL 7735565 (D. Minn. Dec. 27, 2016) (upholding transfer eligibility conditions).

Extracurricular activities that involve team sports, including cheerleading, have the added element of depending upon team cohesion or team unity, an element that has been recognized by the courts. *Lowery, supra*. The Supreme Court has also noted that for extracurricular activities, there is no distinction between campus activities and off-campus activities.

> We make no distinction between campus activities and the off-campus expressive activities of objectionable RSO's [registered student organizations]. . . . We find no principled way, however, to impose upon the University, as a constitutional matter, a requirement to adopt geographic or spatial restrictions as a condition for RSOs' entitlement to reimbursement. . . . Universities, like all of society, are finding that traditional conceptions of territorial boundaries are difficult to insist upon in an age marked by revolutionary changes in communications, information transfer, and the means of discourse. If the rule of viewpoint neutrality is respected, our holding affords the University latitude to adjust its extracurricular student speech program to accommodate these advances and opportunities.

*Bd. of Regents of Univ. of Wisconsin Sys. v. Southworth*, 529 U.S. 217, 234 (2000).

#### 2. The Educational and Team-Building Purposes for the Rules of Conduct

Wholly absent from the lower court's decision is any consideration of the connection between the rules of conduct that the Student violated and the educational purpose for those rules. Not only was the educational purpose and efforts to teach sportsmanship ignored by the court below, it was dismissed as

immaterial when the court concluded that the School District's expert opined on immaterial matters. J.A. 25 ("The District asked Dr. Mussoline to provide his opinions on immaterial matters.")

At bar, the School District's handbook that is distributed annually to students makes it clear that participation on the cheerleading squad is considered to be a privilege and that students are expected to comport themselves properly. The handbook provides:

> ***Participation on an athletic team or cheerleading squad in the Mahanoy Area School District is a privilege*** and the participants must earn the right to represent Mahanoy Schools by conducting themselves in such a way that the image of the Mahanoy School District would not be tarnished in any manner. Any participant whose conduct is judged to reflect a discredit upon himself/herself, the team, or the Mahanoy Schools, whether or not such activity takes place during or outside school hours during the sports season, will be subject to disciplinary action as determined by the coach, the athletic director and/or the school principal.

J.A. 486 (emphasis added).

In addition to the rules contained in the student handbook, there were additional Cheerleading Rules that included the following provision about conduct:

> ***Please have respect for your school, coaches, teachers, other cheerleaders*** and teams. Remember, you are representing your school when at games, fundraisers, and other events. ***Good sportsmanship will be enforced, this includes foul language and inappropriate gestures***.

J.A. 439 (emphasis added).

One of the teachers and coaches who wrote the Cheerleading Rules testified about the pedagogical purposes of the rules as follows:

> The main purpose of the rules is to not only teach our students that they have to follow rules, and if they don't follow them there's consequences, but in addition to that we want to teach them team-building skills and skills that they will take with them after they graduate.

J.A. 81. This evidence is undisputed and was highlighted by the School District's educational expert in this case, Dr. Lawrence Mussoline, who said:

> It is through these extracurricular rules that we impart very important life's skills. For example, if B.L. were hired by a private company after graduation from college and she were to post on social media on-line the exact message she posted about the school and cheer squad with respect to her private employer, she would be rightfully disciplined if not fired.
>
> These rules characteristically extend well beyond the school day into the home to ensure proper training, proper preparation, responsibility, resilience, and respect. All critical, non-cognitive life skills needed after graduation from high school to be successful in the job word and in life.
>
> * * *
>
> The educational purpose of extracurricular rules is again to prepare young men and women for life beyond high school. The operative question in this situation is: Can you be fired from your job for an aberrant social media post? Like the answer to so many legal questions; it depends. As more and more people are using social media, this area has become a common ground for employees to post information about their jobs, their personal lives, their views and other aspects of their lives that do not pertain to their work. However, in some cases, employers may have grounds to fire employees for their social media conduct and in fact they have. My question here is what are we teaching B.L. about authority, rules and the world of work in

> the 21st century if these simple rules clearly articulated by the coach aren't upheld?

J.A. 507.

However, these concepts were wholly ignored by the court below. A fair reading of the decision below was that once it was found that the Student's conduct occurred outside of school, the School District had no right to take any action against the student. The court said: "The District's concession that B.L.'s speech occurred off-campus is all but fatal." J.A. 19. According to the court below, the only way that the School District could act against the Student is if it could show disruption to school in accordance with the Supreme Court's decision in *Tinker*.[1] We submit that such a conclusion is not justified when considering the Student's conduct, the nature of the Student's speech, and the context of the conduct and speech.

When it comes to a student's voluntary decision to participate in extracurricular sports, the Supreme Court made it clear in *Vernonia* that school districts can impose rules of conduct on students. When it comes to educating students, the Supreme Court held in *Fraser* that it was a proper purpose for school

---

[1] This case also meets the substantial disruption standard of Tinker as set out in *Lowery*. In that case, the Sixth Circuit held that the circulation of a petition challenging the authority of a football coach "was reasonably likely to cause substantial disruption on the Jefferson County football team." *Lowery*, 497 F.3d at 594. In this case, one cheerleading coach testified that several team members were visibly upset by the Student's posts and repeatedly asked if there was anything that the coaches could do about it. J.A. 210-11.

district to "inculcate the habits and manners of civility." *Fraser at* 681. Relying on *Fraser's* teachings, the Ninth Circuit said: "[S]chool officials may suppress speech that is vulgar, lewd, obscene, or plainly offensive without a showing that such speech occurred during a school-sponsored event or threatened to 'substantially interfere with [the school's] work.'" *Chandler*, 978 F.2d at 529 (*quoting Tinker*, 393 U.S. at 509).

**3. The Degree of Protection for Speech.**

**i. Free speech jurisprudence generally.**

It is submitted that the Student's speech was not protected by the Free Speech Clause of the First Amendment.[2]

Not all speech is protected, and not all speech is protected to the same degree. In addition, speech that is protected in one context is not protected in another. Whether speech is protected depends upon the nature of the speech and its context. "[I]t is well understood that the right of free speech is not absolute at

---

[2] The Court below correctly noted that the parties largely focused on the first prong of the typical three-part standard generally applicable to free speech retaliation claims – whether the speech is protected. The court said: "Although the parties have not referenced this standard in their briefing, their arguments are primarily focused on the first step – that is, whether B.L.'s speech was protected." J.A. 13. We agree with this statement, and we concede that the only real issue is whether the Student's speech was protected from sanction by the School District under the context presented here. If it was not protected, the Student satisfies the second and third elements of the test – i.e., whether the Student was punished, and whether there was a causal link between the Student's speech and the punishment – if that is the standard to be applied.

all times and under all circumstances." *Chaplinsky v. State of New Hampshire*, 315 U.S. 568, 571 (1942). Said another way, "The First and Fourteenth Amendments have never been treated as absolute . . . ." *Miller v. California*, 413 U.S. 15, 23 (1973). The Fifth Circuit Court of Appeals reversed a lower court decision when not all relevant factors were considered. The Court said:

> The constitution protects not simply words but communication, which presupposes a speaker and a listener, and circumscribes this protection for purposes which enhance the functioning of our republican form of government. ***The "rights" of the speaker are thus always tempered by a consideration of the rights of the audience and the public purpose served, or disserved, by his speech.*** Appellant's argument, by ignoring his audience and the lack of any public purpose in his offensive epithets, founders on several fronts.

*Martin v. Parrish*, 805 F.2d 583, 584 (5th Cir. 1986) (emphasis added). We submit that Judge Caputo's analysis of the nature and context of the Student's speech missed the mark; ignored an express exception contained in *Tinker* for matters involving student deportment; and did not consider the relevant facts, legal precedent or context.

With respect to profanity, the District Court for the District of Oregon explained when profanity is and is not protected, saying:

> One category omitted from the list recited in [*U.S. v.*] *Alvarez*,[567 U.S. 709 (2012)] but included in *Chaplinsky*, is profanity. Cases indicate that whether profane speech is constitutionally protected may in fact depend on its context and thus, it is not categorically protected or categorically unprotected. *See Bonnell v. Lorenzo*, 241 F.3d 800, 821 (6th Cir. 2001) ("it has long been held that despite the sanctity of the First Amendment, speech that is vulgar or profane is not entitled

> to absolute constitutional protection") (*citing FCC v. Pacifica Foundation*, 438 U.S. 726, 747, 98 S.Ct. 3026, 57 L.Ed.2d 1073 (1978)). For example, profanity as political expression when communicated in a courthouse is protected speech. *Cohen v. California*, 403 U.S. 15, 91 S.Ct. 1780, 29 L.Ed.2d 284 (1971) (state could not, consistent with the First Amendment, punish the defendant for wearing a jacket which bore the words "Fuck the Draft" in a courthouse). And, profanity-laced criticism of police officers is also protected speech. *E.g., United States v. Poocha*, 259 F.3d 1077 (9th Cir. 2001) (defendant's utterance of "fuck you" or "that's fucked" to National Park Service ranger was constitutionally protected).
>
> In contrast, profane and vulgar speech is not protected in the school setting. *Bethel Sch. Dist. v. Fraser*, 478 U.S. 675, 106 S.Ct. 3159, 92 L.Ed.2d 549 (1986). Judge Acosta recognized that under *Bethel*, schools, in order to protect minors from exposure to "vulgar and offensive spoken language," may restrict the use of lewd, vulgar, and profane language. F&R at 14 (discussing *Bethel*, 478 U.S. at 684, 106 S.Ct. 3159 (citing *Pacifica Foundation*, 438 U.S. at 748-51, 98 S.Ct. 3026 (government's prohibition of radio broadcast of monologue which depicted sexual and excretory activities in a patently offensive manner at a time when children were undoubtedly in the audience was constitutionally permissible))); *see also B.H. ex rel. Hawk v. Easton Area Sch. Dist.*, 725 F.3d 293, 319 (3d Cir. 2013) ("Under [Bethel School District v.] *Fraser*, a school may categorically restrict plainly lewd, vulgar, or profane speech . . . regardless of whether it can plausibly be interpreted as commenting on social or political issues").
>
> The Ninth Circuit has held that "school officials may suppress speech that is vulgar, lewd, obscene, or plainly offensive without a showing that such speech occurred during a school-sponsored event." *Chandler v. McMinnville Sch. Dist.*, 978 F.2d 524, 529 (9th Cir. 1992).

*Knotts v. Oregon Trail Sch. Dist. 46,* No. 3:15-cv-2296-AC, 2017 WL 4861521, at *3-4 (D.Ore. Oct. 26, 2017).

The fact that not all speech is protected cannot be denied. As the Supreme Court noted:

> "From 1791 to the present," however, the First Amendment has "permitted restrictions upon the content of speech in a few limited areas," and has never "include[d] a freedom to disregard these traditional limitations." *Id*. [*R.A.V. v. St. Paul*, 505 U.S. 377 (1992)] at 382-383, 112 S.Ct. 2538. These "historic and traditional categories long familiar to the bar," *Simon & Schuster, Inc. v. Members of N.Y. State Crime Victims Bd.*, 502 U.S. 105, 127, 112 S.Ct. 501, 116 L.Ed.2d 476 (1991) (KENNEDY, J., concurring in judgment) – including obscenity, *Roth v. United States*, 354 U.S. 476, 483, 77 S.Ct. 1304, 1 L.Ed.2d 1498 (1957), defamation, *Beauharnais v. Illinois,* 343 U.S. 250, 254–255, 72 S.Ct. 725, 96 L.Ed. 919 (1952), fraud, *Virginia Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc*., 425 U.S. 748, 771, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1976), incitement, *Brandenburg v. Ohio*, 395 U.S. 444, 447-449, 89 S.Ct. 1827, 23 L.Ed.2d 430 (1969) (*per curiam* ), and speech integral to criminal conduct, *Giboney v. Empire Storage & Ice Co*., 336 U.S. 490, 498, 69 S.Ct. 684, 93 L.Ed. 834 (1949) – are "well-defined and narrowly limited classes of speech, the prevention and punishment of which have never been thought to raise any Constitutional problem." *Chaplinsky v. New Hampshire*, 315 U.S. 568, 571-572, 62 S.Ct. 766, 86 L.Ed. 1031 (1942).

*United States v. Stevens*, 559 U.S. 460, 468-69 (2010).

Plainly stated, "the First and Fourteenth Amendments have never been thought to give absolute protection to every individual to speak whenever or wherever he pleases or to use any form of address in any circumstances that he chooses." *Cohen*, 403 U.S. at 19. "It is apparent that the unconditional phrasing of the First Amendment was not intended to protect every utterance." *Roth*, 354 U.S. at 483.

To determine when speech or expressive conduct is not categorically outside of the protective shield of the Free Speech clause, the courts have carefully applied a set of tests or standards to determine if the speech is protected based on the nature of the expression, the government interest, and the context of the speech. Further, courts have recognized the fact that government, when regulating speech, does so wearing different hats. Government wears the hat of sovereign, the hat of employer, the hat of educator, the hat of law enforcement, the hat of commercial regulator, the hat of regulator, the hat of sponsor of interscholastic sports, as well as other hats. Depending upon which hat is worn, the courts apply different tests or standards. *Waters v. Churchill,* 511 U.S. 661, 671 (1994) ("government as employer indeed has far broader powers than does the government as sovereign").

The Supreme Court explained that "'government has significantly greater leeway in its dealings with citizen employees than it does when it brings its sovereign power to bear on citizens at large.' *Engquist v. Oregon Dept. of Agriculture*, 553 U.S. 591, 599, 128 S.Ct. 2146, 170 L.Ed.2d 975 (2008); *see also NASA v. Nelson*, 562 U.S. ––––, ––––, 131 S.Ct. 746, 758, 178 L.Ed.2d 667 (2011)." *Borough of Duryea, Pa. v. Guarnieri*, 564 U.S. 379, 392 (2011). In *In re Orthopedic Bone Screw Products Liab. Litig.*, 193 F.3d 781, 792 (3d Cir. 1999), your Honorable Court reaffirmed that "[c]ommercial speech is accorded a lesser degree of First Amendment protection than other kinds of speech. However,

regardless of the hat that is being worn by government when it acts, the analysis begins with a consideration of the nature of the speech or expressive conduct and continues with an analysis of the context in which the speech is made.

For example, the court evaluated government's action as sovereign or law enforcer in *Cohen v. California*, 403 U.S. 15 (1971). *Cohen* is the infamous case where the plaintiff was convicted of breach of the peace for walking through a courthouse corridor – a place where women and children were present – wearing a jacket bearing the words "Fuck the Draft." The court did not hold that this speech was protected under the Free Speech Clause merely because words were displayed. On the contrary, the court recognized that Cohen was advocating a political message with his words. It was political expression, political opinion, even if expressed crudely. Indeed, the court did not stop its analysis by simply concluding that it was political speech. On the contrary, the court evaluated the words used in light of other factors that might give the sovereign the right to regulate speech. The court said:

> While the four-letter word displayed by Cohen in relation to the draft is not uncommonly employed in a personally provocative fashion, in this instance ***it was clearly not 'directed to the person of the hearer.'*** [citations omitted] ***No individual actually or likely to be present could reasonably have regarded the words on appellant's jacket as a direct personal insult.***

*Id.* at 20 (emphasis added).

In public employment cases, the initial set of inquiries to be made by the courts is designed to determine whether the speech by the public employee is "protected." These inquiries focus on the question whether the speech is on a matter of "public concern," or whether on balance it impedes the operation of government. *See, e.g., Pickering v. Bd. of Ed. of Twp. High Sch. Dist. 205, Will Cty., Ill.,* 391 U.S. 563 (1968); *Connick v. Myers*, 461 U.S. 138 (1983); *City of San Diego v. Roe*, 543 U.S. 77 (2004); *Borough of Duryea*, *supra*. The test set out in *Pickering* requires a court evaluating restraints on a public employee's speech to balance "the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." 391 U.S. at 568. Indeed, students on extracurricular sports teams, including cheerleaders, represent their schools much in the way that government employees represent their employer. Accordingly, under the *Pickering* test, the fact that the cheerleader in this case was not speaking on a matter of public concern would be fatal to her claim as it would not be protected.

Regarding commercial speech, false and misleading speech may be prohibited by government. *Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc.*, 425 U.S. 748 (1976). On the other hand, core political speech enjoys perhaps the broadest protection under the First Amendment. *See,*

*e.g.*, *First Nat'l Bank of Boston v. Bellotti*, 435 U.S. 765 (1978); *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334 (1995).

In *Tinker*, the Court analyzed the students' speech in school and described it as "pure speech" that expressed political opinion. The Court said, "The school officials banned and sought to punish petitioners for a silent, passive ***expression of opinion***, unaccompanied by any disorder or disturbance on the part of petitioners. There is here no evidence whatever of petitioners' interference, actual or nascent, with the schools' work or of collision with the rights of other students to be secure and to be let alone." *Tinker*, 393 U.S. at 508 (emphasis added).

In First Amendment cases concerning schools, courts have looked not only at the words used and considered the message conveyed, but they also looked at the context in which the words were stated. Succinctly summarizing the Supreme Court precedent addressing the different contexts in which speech has been evaluated against the Free Speech clause, the Supreme Court said:

> Our cases make clear that students do not "shed their constitutional rights to freedom of speech or expression at the schoolhouse gate." *Tinker v. Des Moines Independent Community School Dist.*, 393 U.S. 503, 506, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969). At the same time, we have held that "the constitutional rights of students in public school are not automatically coextensive with the rights of adults in other settings," *Bethel School Dist. No. 403 v. Fraser*, 478 U.S. 675, 682, 106 S.Ct. 3159, 92 L.Ed.2d 549 (1986), and that the rights of students "must be 'applied in light of the special characteristics of the school environment,'" *Hazelwood School Dist. v. Kuhlmeier*, 484 U.S. 260, 266, 108 S.Ct. 562, 98 L.Ed.2d 592 (1988) (quoting *Tinker, supra*, at 506, 89 S.Ct. 733). Consistent with these principles, we hold that

> schools may take steps to safeguard those entrusted to their care from speech that can reasonably be regarded as encouraging illegal drug use. We conclude that the school officials in this case did not violate the First Amendment by confiscating the pro-drug banner and suspending the student responsible for it.

*Morse v. Frederick*, 551 U.S. 393, 396-97 (2007).

In evaluating the context in which speech is expressed, the Supreme Court has made it clear that the message must be weighed on the scales along with the words used and the object of the words. In *Tinker*, the Court gave clear warning that foretold the limits of its statement that students do not shed their constitutional rights at the school steps. The Court said, "***The problem posed by the present case does not relate to*** regulation of the length of skirts or the type of clothing, to hair style, or ***deportment***. [citations omitted] It does not concern aggressive, disruptive action or even group demonstrations." *Id*. at 507-08 (emphasis added). Although *Tinker* is widely cited for the proposition that words that cause disruption are not protected by the First Amendment, the Supreme Court made it clear that language that relates to regulations regarding "deportment" are also subject to enforcement by school authorities. The clear implication by the Court's statement quoted above is that if political expression that does not relate to deportment cannot be regulated, that allegedly expressive conduct that does relate to deportment can be regulated under *Tinker*.

In *Fraser*, the Supreme Court made a number of points that are relevant at bar. The Court said:

> The First Amendment guarantees wide freedom in matters of adult public discourse. A sharply divided Court upheld the right to express an antidraft viewpoint in a public place, albeit in terms highly offensive to most citizens. *See Cohen v. California*, 403 U.S. 15, 91 S.Ct. 1780, 29 L.Ed.2d 284 (1971). It does not follow, however, that simply because the use of an offensive form of expression may not be prohibited to adults making what the speaker considers a political point, the same latitude must be permitted to children in a public school. In *New Jersey v. T.L.O.*, 469 U.S. 325, 340-342, 105 S.Ct. 733, 742–743, 83 L.Ed.2d 720 (1985), we reaffirmed that the constitutional rights of students in public school are not automatically coextensive with the rights of adults in other settings. As cogently expressed by Judge Newman, "the First Amendment gives a high school student the classroom right to wear Tinker's armband, but not Cohen's jacket." *Thomas v. Board of Education, Granville Central School Dist.*, 607 F.2d 1043, 1057 (2d Cir. 1979) (opinion concurring in result).
>
> ***Surely it is a highly appropriate function of public school education to prohibit the use of vulgar and offensive terms in public discourse.*** Indeed, the "fundamental values necessary to the maintenance of a democratic political system" disfavor the use of terms of debate highly offensive or highly threatening to others. ***Nothing in the Constitution prohibits the states from insisting that certain modes of expression are inappropriate and subject to sanctions. The inculcation of these values is truly the "work of the schools."*** *Tinker*, 393 U.S., at 508, 89 S.Ct., at 737 . . . .

*Fraser* at 682-83.

Perhaps best summarizing the point that context matters and that all facts must be considered in determining whether the First Amendment prevents government from acting, the Supreme Court said:

> When we deal with the complex of strands in the web of freedoms which make up free speech, the operation and effect of the method by which speech is sought to be restrained must be subjected to close analysis and critical judgment in the light of the particular circumstances to which it is applied.

*Speiser v. Randall*, 357 U.S. 513, 520 (1958). At bar, the conduct and the nature of the Student's speech was profane and vulgar. Unlike *Tinker* or *Cohen*, it had no political message. The Student's words and picture expressed no opinion but were simply an angry attack upon her cheerleading team. When asked what message she intended to convey, the Student said that she was just mad.

> Q. What did you intend when you posted this Snapchat?
> A. What does that mean?
> Q. It means – were you trying to send a message to someone with this?
> A. I was just mad about everything.

J.A. 65.

The present situation is unlike *Cohen,* where the speaker was not aiming his words at anyone in particular and no one could take his words as a personal insult. In contrast, the Student sent her vulgarity to members of the cheerleading squad, and the picture of her "giving the finger" and the caption to "fuck cheer" are certainly personal insults. The Student stated that she sent the Snap to approximately 250 people, many of whom were students at the school and some of whom were on the cheerleading squad. J.A. 37, 529. Unlike the students in *Tinker* whose conduct did not involve "deportment," to use the language of the Supreme

Court, the Student's picture and words were the essence of unacceptable deportment. The profanity was directed to the cheerleading program and resulted simply because the cheerleading judges did not select her for the varsity cheerleading squad.[3] The Student's conduct is the converse of good sportsmanship.

In *C.H. ex rel. Z.H. v. Oliva*, 226 F.3d 198, 211 (3d Cir. 2000), your Honorable Court referred to vulgar language as "low-value speech" that could be restricted "to a greater extent than would otherwise be permissible." At bar, the lower court gave the Student's vulgarity the same degree of protection as if she had repeated the Gettysburg Address.

This brings us to the two cases in this Circuit that the lower court chiefly relied upon in finding for the Student – *Layshock* and *J.S.* We submit that they are distinguishable and are not controlling. Indeed, your Honorable Court expressly noted that the decisions were not to be applied blindly simply because the offending conduct occurred outside of school. The Court closed its analysis in *Layshock* with the following admonition:

> We need not now define the precise parameters of when the arm of authority can reach beyond the schoolhouse gate because, as we noted earlier, the district court found that Justin's conduct did not disrupt the school, and the District does not appeal that finding. Thus, we need

---

[3] The cheerleading coaches are not among the individuals who judge the cheerleading tryouts, which determine who makes the varsity squad.

> only hold that Justin's use of the District's web site does not constitute entering the school, and that the District is not empowered to punish his out of school expressive conduct under the circumstances here.

*Layshock*, 650 F.3d at 219.[4]

We submit that the school district's authority can reach beyond the schoolhouse gate in this case because of the all of the factors that distinguish this case from *Layshock* and *J.S.* These cases can be distinguished based on the following eight factors.

(1) ***Legal Authority.*** In *Layshock* and *J.S.*, the school districts had no legal authority under the School Code to expel the students from school for out-of-school conduct as Section 510 of the School Code applied in those cases, not Section 511 of the School Code which governs extracurricular activities;[5]

(2) ***Nature of Discipline.*** In both *Layshock* and *J.S.*, the students were suspended from school as well as being subjected to other sanctions. In this case, the Student was not suspended or expelled from school. In *Layshock,* your

---

4 The Court in *J.S.* also make it clear that it was not announcing a universal rule that school districts could never punish out-of-school speech. The Court said, "The [student and parents] argue that the First Amendment 'limits school official[s'] ability to sanction student speech to the schoolhouse itself.' Appellants' Br. 25. While this argument has some appeal, we need not address it to hold that the School District violated J.S.'s First Amendment free speech rights." *J.S.*, 650 F.3d at 927, n.3.

5 The legal authority of school districts to suspend or expel students from school for out-of-school conduct was not addressed in either *Layshock* or *J.S.* The cases were decided solely on First Amendment grounds.

Honorable Court recognized that suspensions and expulsions are much more serious consequences than removal from non-instructional activities, saying: "[I]t is particularly important to note that the court in *Doninger* was careful to explain that it '[had] no occasion to consider whether a different, more serious consequence than disqualification from student office would raise constitutional concerns.' *Id*. at 53. Of course, Justin's consequences were more serious; he was suspended." *Layshock* at 218.

(3) ***Loss of a Privilege.*** Participation in extracurricular activities is a privilege, not a right. Although the student in *Layshock* suffered some consequences with regard to extracurricular activities, the students in both *Layshock* and *J.S.* were excluded from school as a result of their suspensions.

(4) ***Voluntary Activity.*** Like public employment, participation in extracurricular cheerleading is wholly voluntary. Loss of education – as occurs when a student is suspended or expelled – is something wholly different.

(5) ***Eligibility.*** To be eligible to participate in cheerleading, the Student and her parents were required to sign a form agreeing to comply with certain rules of conduct. J.A. 488. No such eligibility requirements were at play in either *Layshock* or *J.S.*. The Supreme Court sanctioned such conditions to attached to voluntary participation in extracurriculars. *Veronica, supra.* This factor was not present in *Layshock* or *J.S.*

(6) ***Lack of Expressive Content.*** Although the social media posts in both *Layshock* and *J.S.* contained vulgarity and profanity, they also contained expressive content attempting to convey some message. For example, the student in *Layshock* argued that the content was protected parody. At bar, in contrast, the Student was unable to articulate any expressive meaning to her conduct; she was just angry. She lashed out in anger, hurling the finger and vulgarity at her friends and teammates – non-expressive conduct that was the antithesis of sportsmanship. The Supreme Court has made it clear that the protection of the First Amendment assumes that an idea is expressed. "All ideas having even the slightest redeeming social importance – unorthodox ideas, controversial ideas, even ideas hateful to the prevailing climate of opinion – have the full protection of the guaranties . . . ." *Roth*, 354 U.S. at 484. In this case, the Student's conduct and words were devoid of even the slightest redeeming social importance. Long ago the Supreme Court plainly stated that the kind of conduct by the Student at bar was not protected by the First Amendment, saying: "[r]esort to epithets or personal abuse is not in any proper sense communication of information or opinion safeguarded by the Constitution . . . ." *Chaplinsky,* 315 U.S. at 572.

The Student's conduct was diametrically opposed to the intent of the rules to which she agreed to abide. The utter absence of a message attached to her conduct

renders her finger and her words to be "nonspeech" for purposes of the First Amendment.

> The dispositive question is whether obscenity is utterance within the area of protected speech and press. Although this is the first time the question has been squarely presented to this Court, either under the First Amendment or under the Fourteenth Amendment, expressions found in numerous opinions indicate that this Court has always assumed that obscenity is not protected by the freedoms of speech and press. [citations omitted]
>
> The guaranties of freedom of expression in effect in 10 of the 14 States which by 1792 had ratified the Constitution, gave no absolute protection for every utterance. Thirteen of the 14 States provided for the prosecution of libel, and all of those States made either blasphemy or *profanity*, or both, statutory crimes. As early as 1712, Massachusetts made it criminal to publish "any filthy, obscene, or profane song, pamphlet, libel or mock sermon" in imitation or mimicking of religious services. Acts and Laws of the Province of Mass. Bay, c. CV, s 8 (1712), Mass. Bay Colony Charters & Laws 399 (1814). Thus, profanity and obscenity were related offenses.
>
> In light of this history, it is apparent that the unconditional phrasing of the First Amendment was not intended to protect every utterance.

*Roth*, 354 U.S. at 481–83. For example, "fighting words" are not protected by the First Amendment because they are considered to be "nonspeech." *R.A.V.*, 505 U.S. at 386 (1992) ("[T]he exclusion of 'fighting words' from the scope of the First Amendment simply means that, for purposes of that Amendment, the unprotected features of the words are, despite their verbal character, essentially a 'nonspeech' element of communication. Fighting words are thus analogous to a noisy sound truck . . . .") Similarly, obscene materials lose their protections under the First

Amendment only when "taken as a whole, [they] do not have serious literary, artistic, political, or scientific value." *Miller*, 413 U.S. at 24. For conduct to receive First Amendment protections, it must be inherently expressive. "Some forms of expressive conduct get First Amendment protection, but this principle extends only to conduct that is 'inherently expressive.'" *Tagami v. City of Chicago*, 875 F.3d 375, 378 (7th Cir. 2017), *as amended* (Dec. 11, 2017), *cert. denied sub nom. Tagami v. City of Chicago, Ill.*, 138 S.Ct. 1577 (2018). At bar, the Student's conduct of transmitting her finger and profanity to friends and teammates was nonspeech unworthy of any protection under the First Amendment.

(7) ***Object of Vulgarity.*** The vulgarity was hurled at the Student's teammates and coaches, and at the activity of cheerleading itself. Courts have recognized that speech that hurts morale can under certain circumstances be prohibited. "A public employee's exercise of free speech rights affects the efficiency of the operation of the public service when it affects the morale of the work force and damages the program's reputation." *Grantham v. Trickey*, 21 F.3d 289, 295 (8th Cir. 1994).

One Court noted: "[b]ecause students 'do not have a general constitutional right to participate in extracurricular athletics, student speech occurring in the context of a school-sponsored athletic program is subject to more restrictions than that occurring in the classroom. *Lowery*, 497 F.3d at 588-89 (noting that while in

the classroom it is "appropriate for students to learn to express and evaluate competing viewpoints," it can be detrimental to an athletic team that depends on the coach to develop and execute a strategy to win)." *Stokey v. N. Canton Sch. Dist.*, No. 5:18-CV-1011, 2018 WL 2234953, at *5 (N.D. Ohio May 15, 2018). By saying "fuck cheer" and sending the message to teammates, the Student's conduct was in the context of cheerleading, as it was motivated by her failure to make the varsity team. Its relationship to cheerleading could not be more direct.

(8) ***Team Morale and Chemistry, Sportsmanship.*** *Layshock* and *J.S.* did not involve team sports. It is clear that giving the finger and throwing a profanity can affect team morale and chemistry and conflicts with the education that the coaches were trying to provide when they adopted the team rules. Other courts have recognized the importance of team morale or chemistry when weighing speech under the First Amendment. *Lowery*, 497 F.3d at 595 ("Conversely, conflict between a player and the coach can shake "the very foundation of team chemistry.") Indeed, under the analysis in *Lowery*, the Student's actions constitute a substantial disruption of the cheerleading team, permitting discipline by school officials under *Tinker*.

Your Honorable Court observed:

> Sometimes . . . the government acts in capacities that go beyond being sovereign. In those capacities, it not only retains its sovereign authority over speech but also gains additional flexibility to regulate speech. *See In re Kendall*, 712 F.3d 814, 825 (3d Cir. 2013)

> (collecting examples). One of those other capacities is K-12 educator. Although "students do not 'shed their constitutional rights to freedom of speech or expression at the schoolhouse gate,'" the First Amendment has to be "applied in light of the special characteristics of the school environment" and thus students' rights to freedom of speech "are not automatically coextensive with the rights of adults in other settings." *Morse*, 551 U.S. at 396-97, 127 S.Ct. 2618 (internal quotation marks and citations omitted).

*B.H.*, 725 F.3d at 303. The case at bar presents one of those cases where government is acting in a capacity beyond being a sovereign. It is acting as an educational institution, offering a voluntary program in which it can create rules for participation and from which students can be removed for violating those rules.

## VI. CONCLUSION

In view of the foregoing, it is respectfully requested that the decision of the Court below be reversed and that judgment be entered in favor of the School District and against the Student.

Respectfully submitted,

Date: June 28, 2019

*<u>/s/ David W. Brown</u>*

Michael I. Levin (PA 21232)
David W. Brown (PA 201553)

LEVIN LEGAL GROUP, P.C.
1800 Byberry Road, Suite 1301
Huntingdon Valley, PA 19006
Phone: (215) 938-6378
mlevin@levinlegalgroup.com
dbrown@levinlegalgroup.com

*Attorneys for Appellant*

**UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT**

| | |
|---|---|
| B.L., a minor, by her father, LAWRENCE LEVY, and her mother, BETTY LOU LEVY | No. 19-1842 |
| *Appellees*, | |
| v. | |
| MAHANOY AREA SCHOOL DISTRICT, | On appeal from the U.S. District Court for the Middle District of Pennsylvania |
| *Appellant*. | |

## CERTIFICATE OF COMPLIANCE

1. This document complies with the word limit of Fed. R. App. P. 32(a)(7)(B) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 10,789 words.

2. This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman.

Date: June 28, 2019

*/s/ David W. Brown*
David W. Brown

**UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT**

| | |
|---|---|
| B.L., a minor, by her father, LAWRENCE LEVY, and her mother, BETTY LOU LEVY | No. 19-1842 |
| *Appellees*, | |
| v. | |
| MAHANOY AREA SCHOOL DISTRICT, | On appeal from the U.S. District Court for the Middle District of Pennsylvania |
| *Appellant*. | |

**CERTIFICATE OF BAR MEMBERSHIP**

Pursuant to L.A.R. 28.3(d), I hereby certify that the attorneys for the Appellant – Michael I. Levin and David W. Brown – are members of the bar of the U.S. Court of Appeals for the Third Circuit.

Date: June 28, 2019

*/s/ David W. Brown*
David W. Brown

**UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT**

| | | |
|---|---|---|
| B.L., a minor, by her father, LAWRENCE LEVY, and her mother, BETTY LOU LEVY | : | No. 19-1842 |
| *Appellees*, | : | |
| v. | : | |
| MAHANOY AREA SCHOOL DISTRICT, | : | On appeal from the U.S. District Court for the Middle District of Pennsylvania |
| *Appellant*. | : | |

**CERTIFICATE OF SERVICE**

I hereby certify that on this 28th day of June, 2019, I electronically re-transmitted the foregoing Brief for Appellant to be filed to the Clerk's Office using the Court's Electronic Case Filing system ("ECF") for filing and transmittal of a Notice of Electronic Case Filing to Appellants' counsel at the following addresses in accordance with Fed. R. App. P. 25(a)(2)(D) and L.A.R. 25.1.

**Molly Tack-Hooper**
**Mary Catherine Roper**
AMERICAN CIVIL LIBERTIES
UNION OF PENNSYLVANIA
P.O. Box 60173
Philadelphia, PA 19102

*Attorneys for Appellees*

**Arleigh Helfer**
**Terry Loscalzo**
SCHNADER HARRISON
SEGAL & LEWIS LLP
1600 Market Street, Suite 3600
Philadelphia, PA 19103

*Attorneys for Appellees*

*/s/ David W. Brown*
David W. Brown

**UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT**

| | | |
|---|---|---|
| B.L., a minor, by her father, LAWRENCE LEVY, and her mother, BETTY LOU LEVY | : | No. 19-1842 |
| *Appellees*, | : | |
| v. | : | |
| MAHANOY AREA SCHOOL DISTRICT, | : | On appeal from the U.S. District Court for the Middle District of Pennsylvania |
| *Appellant*. | : | |

**CERTIFICATE OF IDENTICAL COMPLIANCE OF BRIEFS**

Pursuant to L.A.R. 31.1(c), I hereby certify that this Brief for Appellant has been filed with the Court in both electronic and paper form, and that the text of the electronic brief is identical to the text in the paper copies.

Date: June 28, 2019

*/s/ David W. Brown*
David W. Brown

**UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT**

| | | |
|---|---|---|
| B.L., a minor, by her father, LAWRENCE LEVY, and her mother, BETTY LOU LEVY | : | No. 19-1842 |
| *Appellees*, | : | |
| v. | : | |
| MAHANOY AREA SCHOOL DISTRICT, | : | On appeal from the U.S. District Court for the Middle District of Pennsylvania |
| *Appellant*. | : | |

**CERTIFICATE OF ANTI-VIRUS DETECTION PROGRAM USE**

Pursuant to L.A.R. 31.1(c), I hereby certify that a computer virus detection program had been run on the electronic version of this Brief for Appellant, and that no virus was detected. The virus detection program utilized was Symantec.cloud – Endpoint Protection, NIS-22.8.0.50 / Symantec.cloud – Cloud Agent 3.00.10.2737.

Date: June 28, 2019

*/s/ David W. Brown*
David W. Brown