No. 19-1842

# UNITED STATES COURT OF APPEALS
# FOR THE THIRD CIRCUIT

---

**B.L., a minor, by and through her parents,
LAWRENCE LEVY and BETTY LOU LEVY,**

*Appellee,*

v.

**MAHANOY AREA SCHOOL DISTRICT,**

*Appellant.*

---

**On Appeal from the United States District Court for the
Middle District of Pennsylvania,
No. 17-cv-1734**

---

## BRIEF OF APPELLEE

---

Molly Tack-Hooper
Sara J. Rose
Witold J. Walczak
AMERICAN CIVIL LIBERTIES
UNION OF PENNSYLVANIA
P.O. Box 60173
Philadelphia, PA 19106
(215) 592-1513 x 113

Arleigh P. Helfer III
Theresa E. Loscalzo
SCHNADER HARRISON
SEGAL & LEWIS LLP
1600 Market Street, Suite 3600
Philadelphia, PA 19103
(215) 751-2430

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................... iii

COUNTER-STATEMENT OF ISSUE PRESENTED FOR REVIEW ................... 1

COUNTER-STATEMENT OF THE CASE ........................................... 1

I.      FACTS .............................................................................. 1

II.     PROCEDURAL HISTORY AND RULINGS PRESENTED
        FOR REVIEW ....................................................................... 9

SUMMARY OF ARGUMENT .................................................... 10

COUNTER-STATEMENT OF STANDARD OF REVIEW ................................ 13

ARGUMENT ................................................................................ 14

I.      INTRODUCTION ........................................................... 14

II.     B.L.'S SNAP WAS UNQUESTIONABLY PROTECTED SPEECH. ........ 17

        A.      The Snap Contains Both Pure Speech and Expressive
                Conduct. ............................................................ 17

        B.      The Snap Does Not Fall Into Any of the Categories of
                "Unprotected" Speech. ........................................... 20

III.    MASD CANNOT PUNISH B.L. FOR HER SPEECH BECAUSE
        IT DID NOT POSE A THREAT OF SUBSTANTIAL, MATERIAL
        DISRUPTION .......................................................................... 22

IV.     THE HOLDINGS AND REASONING IN *J.S.* AND *LAYSHOCK*
        APPLY WITH EQUAL FORCE TO THIS CASE. ....................... 25

        A.      This Court, Sitting En Banc, Has Already Held That the
                *Fraser* Exception to *Tinker* Does Not Apply Outside of
                School. ................................................................. 26

        B.      There Is No Exception to *Tinker* That Would Allow Schools
                to Punish Speech Whenever the Punishment Advances a
                School's "Educational Mission." ............................... 28

C.     The First Amendment's Restrictions on Schools' Power to Punish Students for Speech Are Not Limited to Punishment That Infringes on a Student's "Property Right.".................................30

D.     Cheerleaders Are Students, Not School Employees. ..........................34

E.     The Cases MASD Relies on Are All Distinguishable. ......................35

V.     B.L. DID NOT WAIVE HER FIRST AMENDMENT RIGHTS, NOR COULD MASD REQUIRE HER TO WAIVE HER FIRST AMENDMENT RIGHTS, IN ORDER TO PARTICIPATE IN CHEERLEADING. ..........................................................................40

VI.    THE RULES MASD APPLIED TO PUNISH B.L. ARE FACIALLY UNCONSTITUTIONAL. .............................................................42

A.     MASD's Rules Are So Vague That They Impermissibly Vest School Officials With Unbridled Discretion to Censor Speech..........43

B.     The Cheerleading Rules Are Facially Viewpoint Discriminatory......................................................................46

CONCLUSION ...........................................................................49

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Agency for Int'l Dev. v. Alliance for Open Soc'y Int'l,*
570 U.S. 205 (2013)..............................................................................41

*Anderson v. Davila,*
125 F.3d 148 (3d Cir. 1997) ...............................................................31

*Angstadt v. Midd-West Sch. Dist.,*
377 F.3d 338 (3d Cir. 2004) ...............................................................30

*Bd. of Airport Comm'rs of City of L.A. v. Jews for Jesus, Inc.,*
482 U.S. 569 (1987)..............................................................................44

*Bethel Sch. Dist. No. 403 v. Fraser,*
478 U.S. 675 (1986)........................................................................*passim*

*Billman v. Big Spring Sch. Dist.,*
27 Pa. D. & C. 3d 488 (Cumberland Ct. Com. Pl. 1983) ...................39

*Bjorgung v. Whitetail Resort, LP,*
550 F.3d 263 (3d Cir. 2008) ...............................................................13

*Blunt v. Lower Merion Sch. Dist.,*
767 F.3d 247 (3d Cir. 2014) ...............................................................14

*Board of Cty. Commn'rs v. Umbehr,*
518 U.S. 668 (1996)..............................................................................41

*Brockway v. Shepherd,*
942 F. Supp. 1012 (M.D. Pa. 1996)...............................................18, 20

*Chandler v. McMinnville Sch. Dist.,*
978 F.2d 524 (9th Cir. 1992) .........................................................26, 27

*Child Evangelism Fellowship v. Stafford Twp. Sch. Dist.,*
386 F.3d 514 (3d Cir. 2004) .........................................................46, 48

*City of Chicago v. Morales,*
527 U.S. 41 (1999).................................................................................43

*City of Lakewood v. Plain Dealer Publ'g Co.*,
 486 U.S. 750 (1988)......................................................43

*Cohen v. California*,
 403 U.S. 15 (1971)..............................................20, 21, 45

*Commonwealth v. Kelly*,
 758 A.2d 1284 (Pa. Super. 2000) ...............................18–19

*D.N. v. Penn Harris Madison Sch. Corp.*,
 No. 05-cv-716RM, 2006 WL 2710596 (N.D. Ind. Sept. 18, 2006) ..................39

*Delatorre v. Minn. State High Sch. League*,
 202 F. Supp. 3d 1046 (D. Minn. 2016)...............................30

*Delisio v. Ellwood City Area Sch. Dist.*,
 70 Pa. D. & C. 2d 524 (Lawrence Ct. Com. Pl. 1975) ......................39

*Doninger v. Niehoff*,
 527 F.3d 41 (2d Cir. 2008) .....................................24, 25

*Duran v. City of Douglas*,
 904 F.2d 1372 (9th Cir. 1990) ......................................18

*Eichenblaub v. Twp. of Indiana*,
 385 F.3d 274 (3d Cir. 2004) ........................................20

*Erie Telecomms., Inc. v. City of Erie*,
 853 F.2d 1084 (3d Cir. 1988) .......................................40

*Fatava v. Seidel*,
 511 Fed. App'x 155 (3d Cir. 2013) .................................18

*Feldman v. Cmty. Coll. of Allegheny*,
 85 F. App'x 821 (3d Cir. 2004) ....................................33

*Goldenstein v. Repossessors Inc.*,
 815 F.3d 142 (3d Cir. 2016) .......................................14

*Gregoire v. Centennial Sch. Dist.*,
 907 F.2d 1366 (3d Cir. 1990) ......................................45

*B.H. ex rel. Hawk v. Easton Area Sch. Dist.*,
725 F.3d 293 (3d Cir. 2013) (en banc) ...........................14, 23, 26, 29

*B.H. ex rel. Hawk v. Easton Area Sch. Dist.*,
827 F. Supp. 2d 392 (E.D. Pa. 2011), *aff'd*, 725 F.3d 293 (3d Cir.
2013) (en banc) ...................................................................................32

*Hazelwood v. Kuhlmeier*,
484 U.S. 260 (1988)....................................................................15, 25

*Hess v. Indiana*,
414 U.S. 105 (1973)...............................................................................20

*Hurley v. Irish-American Gay, Lesbian & Bisexual Grp. of Boston*,
515 U.S. 557 (1995)...............................................................................19

*Iancu v. Brunetti*,
139 S. Ct. 2294 (2019)..................................................42, 47, 48

*Johnson v. Cache Cty. Sch. Dist.*,
323 F. Supp. 3d 1301 (D. Utah 2018)..................................37, 38

*Johnson v. Zerbst*,
304 U.S 458 (1938)...............................................................................40

*K.A. v. Pocono Mountain Sch. Dist.*,
710 F.3d 99 (3d Cir. 2013) ................................................................32

*Kaucher v. Cty. of Bucks*,
455 F.3d 418 (3d Cir. 2006) ..............................................................13

*King v. Hempfield Sch. Dist.*,
8 Pa. D. & C. 4th 48 (Lancaster Ct. Com. Pl. 1990) ..........................39

*Knotts v. Or. Trail Sch. Dist. 46*,
No. 15-cv-2296, 2017 WL 4861521 (D. Ore. Oct. 26, 2017) ...........36

*Kolender v. Lawson*,
461 U.S. 352 (1983)...............................................................................43

*Layshock ex rel. Layshock v. Hermitage Sch. Dist.*,
650 F.3d 205 (3d Cir. 2011) (en banc) ......................................*passim*

*Lowery v. Euverard*,
497 F.3d 584 (6th Cir. 2006) ...............................................24, 25, 30

*Matal v. Tam*,
137 S. Ct. 1744 (2017)......................................................46, 47, 48

*Members of City Council v. Taxpayers for Vincent*,
466 U.S. 789 (1984)................................................................43

*Metromedia, Inc. v. City of San Diego*,
453 U.S. 490 (1981) (Brennan, J., concurring) ................................43

*Minn. Voters Alliance v. Mansky*,
138 S. Ct. 1876 (2018)........................................................42, 44

*Monn v. Gettysburg Area Sch. Dist.*,
553 F. App'x 120 (3d Cir. 2014) ....................................................33

*Morse v. Frederick*,
551 U.S. 393 (2007)..........................................................*passim*

*Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*,
429 U.S. 274 (1977)................................................................31

*NAACP v. N. Hudson Reg'l Fire & Rescue*,
665 F.3d 464 (3d Cir. 2011) ......................................................13

*New Jersey v. T.L.O.*,
469 U.S. 325 (1985)................................................................38

*Nichols v. Chacon*,
110 F. Supp. 2d 1099 (W.D. Ark. 2000) ..........................................18

*Phillips v. Borough of Keyport*,
107 F.3d 164 (3d Cir. 1997) (en banc) ............................................14

*Pinard v. Clatskanie Sch. Dist. 6J*,
467 F.3d 755 (9th Cir. 2006) ......................................................33

*Pittsburgh League of Young Voters Educ. Fund v. Port Auth.*,
653 F.3d 290 (3d Cir. 2011) ......................................................46

*Rosenberger v. Rector & Visitors of Univ. of Va.*,
515 U.S. 819 (1995)..................................................................46

*Rumsfeld v. FAIR, Inc.*,
547 U.S. 47 (2006)..................................................................41

*Sandul v. Larion*,
119 F.3d 1250 (6th Cir. 1997) .............................................18

*Saxe v. State Coll. Area Sch. Dist.*,
240 F.3d 200 (3d Cir. 2001) ..........................................26, 43

*Schaill v. Tippecanoe Cty. Sch. Corp.*,
679 F. Supp. 833 (N.D. Ind. 1988) ....................................38

*Scott v. Minn. State High Sch. League*,
No. 16-cv-4148, 2016 WL 7735565 (D. Minn. Dec. 27, 2016).......................30

*Se. Promotions, Ltd. v. Conrad*,
420 U.S. 546 (1975)..................................................................43

*J.S. ex rel. Snyder v. Blue Mountain Sch. Dist.*,
650 F.3d 915 (3d Cir. 2011) (en banc) ..........................*passim*

*Stokey v. North Canton Sch. Dist.*,
18-cv-1011, 2018 U.S. Dist. LEXIS 81778 (N.D. Ohio May 15,
2018) ......................................................................................36

*Sypniewski v. Warren Hills Reg'l Bd. of Educ.*,
307 F.3d 243 (3d Cir. 2002) .................................................43

*Tenafly Eruv Ass'n v. Borough of Tenafly*,
309 F.3d 144 (3d Cir. 2002) .................................................19

*Thomas v. Bd. of Educ.*,
607 F.2d 1043 (2d Cir. 1979) ...............................................37

*Thomas v. Indep. Twp.*,
463 F.3d 285 (3d Cir. 2006) .................................................33

*Tinker v. Des Moines Indep. Cmty. Sch. Dist.*,
393 U.S. 503 (1969)..........................................................*passim*

*Troster v. Pa. Dep't of Corr.*,
    65 F.3d 1086 (3d Cir. 1995) ............................................................... 19

*United States v. Playboy Entm't Grp.*,
    529 U.S. 803 (2000) ........................................................................... 14

*Vernonia Sch. Dist. v. Acton*,
    515 U.S. 646 (1995) ....................................................................... 38, 39

*Ziegler v. Martin Vty. Sch. Dist.*,
    831 F.3d 1309 (11th Cir. 2016) ........................................................ 38

## Constitutional Provisions and Procedural Rules

First Amendment ................................................................. *passim*

Fourth Amendment ............................................................ 38, 39

Fed. R. Civ. P. 56(a) ............................................................... 13

## COUNTER-STATEMENT OF ISSUE PRESENTED FOR REVIEW

Does a public school violate the First Amendment when it punishes a student by suspending her from an extracurricular activity for speech that contained profanity and expressed a negative opinion about the activity when the speech occurred entirely outside of school, on the student's own time?

Suggested answer:  Yes.  The District Court ruled on this issue at JA15–24.

## COUNTER-STATEMENT OF THE CASE

### I.  FACTS

B.L. started cheerleading in fifth grade.  JA34; JA127; JA56.  When she tried out for Mahanoy Area High School's cheerleading team in ninth grade, she did not make varsity; she was assigned to the junior varsity squad for the 2016–2017 school year.  JA34; JA127; JA56.

Tryouts for the 2017–2018 cheerleading squads took place in May 2017, toward the end of B.L.'s freshman year.  JA74.  Cheerleaders in the Mahanoy Area School District ("MASD" or "the District") are selected based on their ability to perform cheer routines.  JA158–60.  Tryouts consist of a two-day workshop in which cheerleaders learn and perform "a cheer, a side line, jumps, and a dance."  JA158–9.  Outside judges rate their performance of these routines.  *Id.*  The cheerleaders who score the highest make varsity, while those with lower scores

make JV.  *Id.*  Cheerleaders are not selected based on their character or leadership abilities.  JA159–60.

B.L. again did not make the varsity squad for the 2017–2018 school year. JA74.  She was upset by this news, and asked to see her score.  JA81.  Her frustration was compounded by the fact that a rising freshman had made varsity, while B.L., a rising sophomore, had not.  JA74.  B.L. was also stressed by her impending final exams in school and upset that she had not been assigned to her preferred position in the summer softball league she played in (which was not affiliated with MASD).  JA64; JA302–03; JA375.  B.L. eventually posted a photo and a few choice words on Snapchat to express her anger and frustration.  JA64–65.

Snapchat is a social media platform that is designed to share temporary and ephemeral messages.  JA468–70.  B.L. explained that she uses Snapchat to "rant or post funny stuff" in the same manner in which she would speak to her friends in person when they are not at school.  JA61; JA64–65.  Unlike other social media platforms on which posts are permanent unless the creator intentionally deletes them, Snaps are self-deleting.  JA61–62.  Snapchat users can send a Snap to one or more Snapchat friends, who will be able to access it for up to 10 seconds, or post a Snap to their "Story," where it will be viewable by their Snapchat friends for 24 hours.  JA60–61; JA468–70.  There is no website to which an internet user can

navigate in order to view someone's Snaps. Snaps are only accessible via the Snapchat smartphone "app." JA61–62; JA86; JA468–70; ECF 12 at 2 & n.1.

B.L. created and posted the Snap in question on a Saturday, two days after being rejected from the varsity cheerleading squad. JA62; JA441–43. B.L. was not participating in cheerleading or any other school activity that weekend. JA63; ECF 12 at 2. The 2016–2017 sports season had just ended, and cheerleading practices for the 2017–2018 season had not yet begun. JA62. While she was hanging out with a friend at the Cocoa Hut, a gas station and convenience store in Mahanoy City, B.L. used her personal phone to open the Snapchat app, take a picture of herself and her friend with their middle fingers raised, and post the image to her Snapchat Story with the superimposed text, "Fuck school fuck softball fuck cheer fuck everything[.]" JA484; JA75–76.

The Snap did not mention the District, B.L.'s school, her cheerleading squad, or any individuals, and the photo did not feature any team uniforms, school logos, or school property of any kind. JA63–64; JA36–37; JA129–30; ECF 12 at 2 & n.2.

The Snap remained accessible to B.L.'s Snapchat friends for 24 hours, and automatically self-destructed on Sunday. JA61–62; JA36–37; JA129–30. A cheerleader who was friends with B.L. on Snapchat took a photo of the Snap and gave it to another cheerleader (the daughter of one of the coaches) who was not

friends with B.L. on Snapchat, who in turn gave it to her mother, one of the cheerleading coaches, on Monday.  JA7; JA237–38; JA449–50.

The cheerleading coaches discussed the Snap and decided that B.L. should be punished for violating MASD's Cheerleading Rules.  JA201.

Although MASD's cheerleading program is not especially rigorous in many respects,[1] cheerleaders are required to abide by a set of Cheerleading Rules drafted by the cheerleading coaches.  The Rules address a number of topics.  Most significantly for this case, the Rules contain two provisions that purport to regulate expressive student conduct and speech.

First, in the "SPORTSMANSHIP AND RESPONSIBILITIES/ FUNDRAISING" section (hereinafter, the "'respect' rule"), the Rules state:

> Please have respect for your school, coaches, teachers, other cheerleaders and teams.  Remember, you are representing your school when at games, fundraisers, and other events.  Good sportsmanship will be enforced, this includes foul language and inappropriate gestures.

JA439.  The coaches determine what is "respectful" on a "case by case basis" based on how the coaches "feel."  JA170–71.  The coaches believe that any use of

---

[1]    MASD's cheerleading squads do not compete.  JA163.  Cheerleaders are allowed to play on other athletic teams and participate in other extracurricular activities, and these other activities receive priority over cheerleading for scheduling purposes.  JA162; JA165.  The MASD cheerleading squads may practice as often as twice a week or as infrequently as once a month, depending on the cheerleaders' other commitments.  *Id.*

profanity in a statement about cheerleading—such as "fuck cheer" or "cheerleading is fucking awesome"—violates the "respect" rule even if the statement expresses approval of cheerleading. JA196. MASD conceded that the text of the "respect" rule does not expressly prohibit profanity when cheerleaders are away from school (and not at "games, fundraisers, and other [cheerleading-related] events"), but the coaches nonetheless interpret it to apply to cheerleaders "at all times," whether or not the cheerleader is in uniform. JA170–71.

The second relevant provision, which appears in the "TECHNOLOGY" section (hereinafter, the "'negative information' rule"), states:

> There will be no toleration of any negative information regarding cheerleading, cheerleaders, or coaches placed on the internet.

JA439.

The coaches testified that they interpret this rule to prohibit statements that "demean" a school, another cheerleader, another team, or cheerleading itself. JA174. In their view, the statement "I don't really like cheerleading that much any more" would constitute "negative information regarding cheerleading," but stating that cheerleaders are at high risk for eating disorders would not. JA87; JA174–76. MASD equivocated as to whether criticizing the cheerleading selection process is prohibited. *Compare* JA173; JA219–20 (testifying that B.L. did not violate the Cheerleading Rules by questioning why she and another cheerleader were told they

needed to do a year of JV before they would make varsity while another cheerleader made varsity as a freshman) *and* JA233–34 (same), *with* JA461 (asserting that B.L.'s criticism of the selection process violated the "respect" provision).

The coaches interpret the phrase "placed on the internet" to encompass all "communications that travel over the internet, like emails or text messages," as well as content that is publicly accessible on the internet. JA178–79. They interpret the "negative information" rule to apply to even private digital communications because they can be disseminated publicly by the recipients. JA178; JA184–85.

The District concedes that there is no reason for cheerleaders to be subject to more restrictions on their out-of-school speech than students participating in other activities. JA274. But the District has not identified any other sports team or extracurricular club in the District that has special rules purporting to punish students for their out-of-school speech. JA274; JA144; JA149.

During litigation, the District took the position that the Snap also violated the "personal conduct" provision of the student handbook, a code of conduct applicable to all students. MASD's Br. 21. The "PERSONAL CONDUCT" provision states:

> Participation on an athletic team or cheerleading squad in the Mahanoy Area School District is a privilege and the

6

> participants must earn the right to represent Mahanoy
> Schools by conducting themselves in such a way that the
> image of the Mahanoy School District would not be
> tarnished in any manner. Any participant whose conduct
> is judged to reflect a discredit upon himself/herself, the
> team, or the Mahanoy Schools, whether or not such
> activity takes place during or outside school hours during
> the sports season, will be subject to disciplinary action as
> determined by the coach, the athletic director and/or the
> school principal.

JA486.

The coaches testified that cheerleaders "tattling" on other cheerleaders for perceived rule violations is extremely common. JA199. They explained that, although the coaches do not encourage this "tattling," the cheerleaders do it anyway, offering the coaches unsolicited reports that, for example, a cheerleader has jewelry on, is wearing the wrong shirt, or forgot her bloomers. JA194–95; JA199. As one coach testified, "I get texts from all different girls at all times of the day about different situations" involving rule violations. *Id.*

The cheerleaders also frequently hear reports about negative things cheerleaders say to each other, which the coaches characterize as a "fairly typical occurrence" with teenage girls. JA179–82; JA195. The coaches often have to "mediate" these conflicts. JA179–82; JA195.

Three days after receiving a photo of the Snap, and after the cheerleading coaches discussed the Snap and what to do about it, one of the cheerleading coaches pulled B.L. out of class to inform her that she was dismissed from the

cheerleading squad because of the Snap.  JA37; JA130; ECF 12 at 2–3.  Although the coaches admitted that the Cheerleading Rules do not "specifically address out-of-school speech," JA162–63, they explained during litigation that they viewed the phrase "fuck cheer" in the Snap as violating the "respect" and "negative information" rules no matter when or where a cheerleader utters it.  JA170–72; JA196; JA233–34; JA238–39.[2]

The coaches did not base B.L.'s punishment on its impact on school activities.  JA208–12.  They testified that B.L.'s Snap did not disrupt any classroom or school activities.  JA208–10.  While the Snap itself had no effect on school activities, other students "briefly" diverted one of the cheerleading coaches' attention away from her class by reporting to her that B.L. had posted something "inappropriate" and asking the coach what she was going to do about it.  JA208–10.

The coaches also did not base B.L.'s punishment on any anticipated disruption.  MASD conceded that it had no reason to believe that the Snap would disrupt classroom or school activities.  JA211–12; JA275.  MASD had not previously experienced any disruption of class or school activities because of anything a student said outside of school.  JA211–12; JA275.

---

[2]     The coaches testified that the other phrases in the Snap—"fuck school," "fuck softball," and "fuck everything"—did not violate their rules, in their view. JA205.

## II.    PROCEDURAL HISTORY AND RULINGS PRESENTED FOR REVIEW

B.L. and her parents made repeated requests that the District reconsider B.L.'s punishment.  They appealed to the cheerleading coaches, as well as the athletic director, high school principal, superintendent, and school board, all of whom stood by the coaches' decision.  JA38–41; JA131–32; JA441–43; JA445; JA55; JA256, JA260; JA366–67; ECF 12 at 3.

Having been rebuffed by MASD, B.L. commenced this action through her parents in the fall of 2017.  The day after B.L. filed the complaint, the District Court entered a temporary restraining order directing the District to restore B.L. to the cheerleading squad, and scheduled a hearing on plaintiff's motion for a preliminary injunction.  ECF 5.  After receiving evidence and hearing oral argument on her motion, the District Court entered an order preliminarily enjoining MASD from punishing B.L. for her Snap.  ECF 12; ECF 13.

After discovery, the parties filed cross-motions for summary judgment.  ECF 33–ECF 34; ECF 37–ECF 41; ECF 49–ECF 53; ECF 55.  B.L. also filed a motion to exclude the use of the expert report or expert testimony of MASD's purported expert, Dr. Mussoline, on the basis that his opinions were unsupported by any ascertainable methodology, irrelevant to any issue in the case, and largely outside the scope of his expertise.  ECF 35; ECF 36; ECF 54.

The District Court granted summary judgment for B.L. and denied MASD's summary judgment motion, holding that this Court's decisions in *J.S.* and *Layshock* prohibit punishment for off-campus profanity, regardless of whether the school's punishment consists of removal from extracurricular activities or suspension or expulsion from class.  JA15–20.

The District Court also held that the opinions MASD solicited from its purported expert witness were "immaterial" to the issues in the case.  JA25.  The District Court explained that even if it had considered Dr. Mussoline's opinions, they would not change the outcome.  *Id*.  It denied B.L.'s motion to exclude Dr. Mussoline's testimony as "moot" in light of the grant of summary judgment for B.L.  *Id.*

MASD filed a notice of appeal.  JA1.  B.L. filed an unopposed motion to extend the time to file a fee petition until after the resolution of MASD's appeal, which the Court granted.  ECF 63.

## SUMMARY OF ARGUMENT

This case is about how far public schools may reach to regulate the speech of students when they are not at school.  B.L. was suspended from her school's cheerleading team as punishment for a Snapchat post that said "fuck cheer," which she created on her own smartphone, on her own time on a weekend, while off-campus and not participating in any school-sponsored activity.  The District Court

found that the record lacked evidence that B.L.'s Snap caused, or was likely to cause, a substantial disruption of the school environment, JA23, and MASD does not argue otherwise on appeal.

This Court has already held that the First Amendment prohibits public schools from "reaching beyond the schoolyard" to "punish a student for expressive conduct that originated outside of the schoolhouse, did not disturb the school environment and was not related to any school sponsored event." *Layshock ex rel. Layshock v. Hermitage Sch. Dist.*, 650 F.3d 205, 207 (3d Cir. 2011) (en banc); *see also J.S. ex rel. Snyder v. Blue Mountain Sch. Dist.*, 650 F.3d 915, 920 (3d Cir. 2011) (en banc) (holding that school violated First Amendment when it punished a student for creating an offensive internet post outside of school "that indisputably caused no substantial disruption in school and that could not reasonably have led school officials to forecast substantial disruption in school"). Applying the controlling en banc decisions of this Court, the District Court correctly determined that MASD's punishment of B.L. violated the First Amendment.

Desperate to find a way around this Court's binding precedent, MASD proposes that this Court create a new exception to the First Amendment that flies in the face of decades of jurisprudence. Specifically, they ask the Court to allow schools to control students' speech at all times by stripping students of "privileges," such as participation in extracurricular activities, as punishment for

out-of-school speech that school officials dislike.

The Supreme Court has repeatedly warned against giving schools "absolute authority over their students," making them "enclaves of totalitarianism." *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 511 (1969). And this Court in *Layshock* rejected as "unseemly and dangerous" the idea that schools should be able to "reach into a child's home and control his/her actions there to the same extent [they] can control that child when he/she participates in school sponsored activities." *Layshock*, 650 F.3d at 216. Fundamental First Amendment principles plainly forbid giving schools the power to censor student speech outside of school.

Indeed, this Court, sitting en banc, has already rejected MASD's argument that *Bethel School District Number 403 v. Fraser*, 478 U.S. 675 (1986), allows schools to punish students for their offensive or profane speech when the speech takes place off-campus, outside of school activities, and without the use of school resources. *J.S.*, 650 F.3d at 920, 923 & n.12, 925, 933; *Layshock*, 650 F.3d at 209, 219. And even if it were clear that schools may punish offensive, off-campus speech under *Tinker* (which it is not), the District's punishment of B.L.'s speech would still violate the First Amendment because, as in *J.S.* and *Layshock*, there was no reason for the School District to anticipate that B.L.'s out-of-school speech would cause substantial, material disruption to school activities.

In the face of this clear and binding authority protecting young people's out-of-school speech, MASD's brief meanders through numerous unavailing arguments, cherry-picking language from opinions in cases that have nothing to do with students' speech rights outside of school. The Court should reject MASD's invitation to inject irrelevant concepts into student speech doctrine. Neither precedent nor logic supports MASD's proposed weakening of students' speech rights and expansion of schools' power far beyond the school day and the schoolhouse gates. MASD's arguments are impossible to reconcile with the well-established principle that "the reach of school authorities is not without limits." *Layshock*, 650 F.3d at 216.

## COUNTER-STATEMENT OF STANDARD OF REVIEW

This Court reviews district courts' summary judgment rulings *de novo*. *Layshock ex rel. Layshock v. Hermitage Sch. Dist.*, 650 F.3d 205, 211 (3d Cir. 2011) (en banc) (citing *Bjorgung v. Whitetail Resort, LP*, 550 F.3d 263, 268 (3d Cir. 2008)). A movant is entitled to summary judgment if it shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A fact is "material" only if it has the potential to alter the outcome of the case. *NAACP v. N. Hudson Reg'l Fire & Rescue*, 665 F.3d 464, 475 (3d Cir. 2011) (citing *Kaucher v. Cty. of Bucks*, 455 F.3d 418, 423 (3d Cir. 2006)).

In First Amendment cases, the government bears the burden to justify its restrictions on speech. *United States v. Playboy Entm't Grp.*, 529 U.S. 803, 816–17 (2000) (citations omitted); *B.H. ex rel. Hawk v. Easton Area Sch. Dist.*, 725 F.3d 293, 321 (3d Cir. 2013) (en banc); *Phillips v. Borough of Keyport*, 107 F.3d 164, 172–73 (3d Cir. 1997) (en banc). The party that does not bear the burden of proof at trial is entitled to summary judgment if the party with the burden of proof fails sufficiently to establish the existence of an essential element of its case. *Goldenstein v. Repossessors Inc.*, 815 F.3d 142, 146 (3d Cir. 2016) (citing *Blunt v. Lower Merion Sch. Dist.*, 767 F.3d 247, 265 (3d Cir. 2014)).

## ARGUMENT

### I.    INTRODUCTION

As the District Court explained, *Tinker* establishes the general rule that public schools generally may not punish students for their speech absent a showing that the speech caused substantial, material disruption to school activities, or that the school reasonably anticipated that it would do so. JA9–10 (citing *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 513 (1969)). Although it is an open question whether satisfying *Tinker* is sufficient to justify a school's punishment of students' out-of-school speech, the District Court correctly noted that demonstrating a substantial, material disruption is a threshold requirement for

punishing out-of-school speech. JA24.[3] The District Court found that MASD

failed to adduce any record evidence suggesting that it had reason to anticipate that

B.L.'s Snap would substantially, materially disrupt school activities. JA23.

Indeed, MASD does not argue otherwise. The District Court properly concluded

that, in light of this failure, the fact that the speech occurred outside of school was

"all but fatal" to the District's ability to meet its burden to justify its punishment of

B.L. under the First Amendment. JA19. As the District Court explained, although

the Supreme Court has recognized a few narrow circumstances in which schools

may punish student speech without a showing of substantial, material disruption,

none is present here. While schools may punish students' use of profanity during

school activities without satisfying *Tinker*, *see Bethel School District v. Fraser*,

478 U.S. 675, 685 (1986), this Court, sitting en banc, has already held—twice—

that the *Fraser* exception does not apply to out-of-school speech. *J.S.*, 650 F.3d at

932; *Layshock*, 650 F.3d at 216–19. *See infra* § IV(A).

Faced with this binding authority, MASD makes several novel and

unpersuasive arguments in an attempt to make an end run around the First

---

[3]     The District Court noted that schools may also be able to punish out-of-school speech that bears the imprimatur of the school under *Hazelwood v. Kuhlmeier*, 484 U.S. 260 (1988), but noted that "[a] passing reference to cheerleading on B.L.'s private social media account does not equate to an imprimatur." JA19–23.

Amendment. None of MASD's arguments provides any basis for reversing the well-reasoned decision of the District Court. *See infra* § IV.

First, it is plain that B.L.'s Snap is entirely protected speech. *See infra* § II. It contains both pure speech and unambiguously expressive conduct, both of which are protected by the First Amendment. Neither the phrase "fuck cheer" nor a raised middle finger falls into any category of unprotected speech (such as fighting words or obscenity).

Second, the new exceptions to student speech doctrine that MASD urges this Court to create are wholly without doctrinal support and flatly inconsistent with the First Amendment principles articulated by the Supreme Court and this Court. There is no student speech doctrine that allows schools to circumvent the requirements of *Tinker* whenever punishing a student for speech would serve the school's "educational mission." *See infra* § IV(B). Nor is there any exception that allows schools to punish students for their speech as long as the punishment does not strip the student of any "protected property right." *See infra* § IV(C). Likewise, there is no authority that would allow this Court to treat cheerleaders like government employees rather than students for purposes of their First Amendment rights. *See infra* § IV(D). The cases MASD relies on in support of its proposed new First Amendment exceptions involve entirely different factual

circumstances and legal claims, and are not applicable to the case at hand.  *See infra* § IV(E).

Third, schools may not condition participation in extracurricular activities upon students' waiver of their First Amendment rights outside of school.  This would violate the "unconstitutional conditions" doctrine.  And even if it were permissible, the District Court correctly concluded that MASD has failed to demonstrate that B.L. knowingly and voluntarily waived her First Amendment rights in this case.  *See infra* § V.

Finally, the rules that MASD invoked as justification for B.L.'s punishment are facially unconstitutional.  Regulations of speech violate the First Amendment when they are so vague as to vest government officials with virtually unbridled discretion to censor speech, or discriminate based on viewpoint.  Although the District Court declined to reach these arguments, they provide alternative bases for affirming the decision below.  *See infra* § VI.

## II.  <u>B.L.'S SNAP WAS UNQUESTIONABLY PROTECTED SPEECH.</u>

### A.  **The Snap Contains Both Pure Speech and Expressive Conduct.**

MASD's argument that B.L.'s Snap is "conduct with no expressive content" and is thus unprotected by the First Amendment fails the laugh test.  *See*, *e.g.*,

MASD Br. 38–39 (referring to "the utter absence of a message" in B.L.'s Snap and analogizing it to "a noisy sound truck").

It is undisputed that B.L. was punished for the words "fuck cheer" and the middle-finger gesture in the Snap. MASD punished B.L. because of the message her Snap conveyed, not in spite of it. After MASD punished B.L. for her disrespectful missive, MASD's argument that the Snap expressed no message is at best contradictory and at worst disingenuous.

There is no question that B.L.'s Snap constitutes protected expression under longstanding First Amendment precedent. The words B.L. wrote in the Snap are pure speech, not expressive conduct. And the gesture depicted in the Snap is plainly expressive conduct. *E.g.*, *Fatava v. Seidel*, 511 Fed. App'x 155, 156 (3d Cir. 2013) (referring to extending the middle finger as "a well-known one-fingered gesture").[4]

---

[4]     *See also Sandul v. Larion*, 119 F.3d 1250, 1255 (6th Cir. 1997) (display of middle finger is protected speech); *Duran v. City of Douglas*, 904 F.2d 1372, 1378 (9th Cir. 1990) (same); *Nichols v. Chacon*, 110 F. Supp. 2d 1099, 1110 (W.D. Ark. 2000) (same); *Brockway v. Shepherd*, 942 F. Supp. 1012, 1017 (M.D. Pa. 1996) ("The use of profane or vulgar language is protected by the First Amendment unless some exception to the general principle applies. That is, standing alone, profane or vulgar language is not itself obscene and does not amount to fighting words. The same principle applies to the use of a gesture which represents profane or vulgar language, and the communication must be looked at in its entirety and in context to determine whether an exception to the general protection of speech applies."); *Commonwealth v. Kelly*, 758 A.2d 1284, 1288 (Pa. Super. 2000) (use of

Speech and expressive conduct are protected equally under the First Amendment. *See*, *e.g.*, *Tenafly Eruv Ass'n v. Borough of Tenafly*, 309 F.3d 144, 158 (3d Cir. 2002) (First Amendment protects "speaking and writing" as well as "some nonverbal acts of communication, viz., 'expressive conduct' (or 'symbolic speech')"). Indeed, *Tinker* involved "expressive conduct"—the wearing of black armbands to signify opposition to the Vietnam War. The Court explained that the symbolic act was "closely akin to 'pure speech'" and was entitled to full First Amendment protection. *Tinker*, 393 U.S. at 505–06.

Speech and expressive conduct need not convey a "narrow, succinctly articulable message" to be protected by the First Amendment. *Troster v. Pa. Dep't of Corr.*, 65 F.3d 1086, 1090 (3d Cir. 1995); *see also Tenafly Eruv Ass'n*, 309 F.3d at 160 (acknowledging that *Hurley* eliminated the "particularized message" test). As the Supreme Court observed, if the First Amendment protected only expression that conveyed a "particularized message," it "would never reach the unquestionably shielded painting of Jackson Pollock, music of Arnold Schoenberg, or Jabberwocky verse of Lewis Carroll." *Hurley v. Irish-American Gay, Lesbian & Bisexual Grp. of Boston*, 515 U.S. 557, 569 (1995).

---

*Continued from previous page*

middle finger was angry gesture meant to express disrespect for municipal worker and did not constitute obscenity or fighting words).

**B.** **The Snap Does Not Fall Into Any of the Categories of "Unprotected" Speech.**

There is a clear the distinction between speech that is wholly unprotected by the First Amendment and protected speech that may be subject to government regulation in some circumstances. The Supreme Court has recognized only a few "narrow categories" of unprotected speech, including obscenity, fighting words, incitement, and defamation. *E.g.*, *Eichenblaub v. Twp. of Indiana*, 385 F.3d 274, 282–83 (3d Cir. 2004). Other than these categories, "all speech is protected by the First Amendment." *Id.* at 282–83.

Profanity (swearing) does not fall into any of these unprotected categories. The Supreme Court decided almost fifty years ago that the expletive "fuck," used in a non-sexual context, does not count as fighting words or obscenity. *Cohen v. California*, 403 U.S. 15, 20 (1971) (jacket with the words "Fuck the Draft" is protected speech, not obscenity or fighting words); *see also Hess v. Indiana*, 414 U.S. 105, 107 (1973) (yelling "we'll take the fucking street later" was not obscenity or fighting words). Nor does the middle-finger gesture constitute fighting words or obscenity. *See Brockway*, 942 F. Supp. at 1017. The Supreme Court explained in *Cohen v. California* the difficult line-drawing problems that would result if government officials were permitted to sanitize public discourse of swear words:

> [T]he principle contended for by the State seems inherently boundless.  How is one to distinguish this from any other offensive word?  Surely the State has no right to cleanse public debate to the point where it is grammatically palatable to the most squeamish among us.  Yet no readily ascertainable general principle exists for stopping short of that result were we to affirm the judgment below.  For, while the particular four-letter word being litigated here is perhaps more distasteful than most others of its genre, it is nevertheless often true that one man's vulgarity is another's lyric.  Indeed, we think it is largely because government officials cannot make principled distinctions in this area that the Constitution leaves matters of taste and style so largely to the individual.

403 U.S. at 25.

MASD's brief elides the distinction between unprotected speech and protected speech that may be regulated in the school context.  MASD's Br. 24–42. *Tinker* and its progeny do not hold that student speech is another category of speech that is unprotected by the First Amendment.  Quite the opposite: *Tinker* stated explicitly that students do not shed their First Amendment rights at the schoolhouse gate.  *Tinker*, 393 U.S. at 506.  Rather *Tinker* and its progeny hold that the "special characteristics of the school environment" justify permitting schools to regulate students' protected speech in some circumstances, even though the government would not be able to regulate it to the same extent—if at all— outside of school.  *Id*.; *Layshock*, 650 F.3d at 212.

But, as explained below, none of the circumstances in which schools are permitted to punish students for their speech is present here.

### III. MASD CANNOT PUNISH B.L. FOR HER SPEECH BECAUSE IT DID NOT POSE A THREAT OF SUBSTANTIAL, MATERIAL DISRUPTION.

*Tinker* sets the default rule that public schools generally may not punish students for their protected speech absent some basis for anticipating that the speech will cause "substantial, material disruption" to school activities. *Tinker*, 393 US. at 513.

It is an open question whether public schools can ever punish students' out-of-school speech—even if the *Tinker* standard is satisfied. JA24; *see J.S.*, 650 F.3d at 936 (Smith, J., concurring) (writing separately to answer the question left open by the majority—whether schools can punish students for out-of-school speech); *Layshock*, 650 F.3d at 219–20 (Jordan, J., concurring) (observing that neither *J.S.* nor *Layshock* answers the open question of whether *Tinker* can be applied to out-of-school speech).

The Court need not answer that question in this case. Even assuming schools had such authority, it is settled in this Circuit that schools cannot punish out-of-school speech like B.L.'s without at least satisfying *Tinker*. And the undisputed facts demonstrate that B.L.'s Snap did not cause substantial, material disruption. Nor did MASD have any reason to anticipate that it would. JA208–11.

Substantial, material disruption is a high bar. Although schools need not wait for actual disruption to occur, an "undifferentiated fear or apprehension of disturbance" is insufficient. *Id.* at 508; *see also B.H. ex rel. Hawk v. Easton Area Sch. Dist.*, 725 F.3d 293, 321 (3d Cir. 2013) (en banc) ("*Tinker* meant what it said: 'a specific and significant fear of disruption, not just some remote apprehension of disturbance.'") (quoting *J.S.*, 650 F.3d at 928). In *Tinker*, the plaintiffs' black armbands "caused comments, warnings by other students, the poking of fun at them, and a warning by an older football player that other, nonprotesting students had better let them alone," nor sufficient that a math teacher "had his lesson period practically 'wrecked' chiefly by disputes with Mary Beth Tinker" over the armband. *Tinker*, 393 U.S. at 517–18 (Black, J., dissenting). But the Court held that the record evidence showing that the armbands "divert[ed] students' minds from their regular lessons" and caused "talk" and "comments" was not enough disruption to justify punishing the plaintiffs for their speech. *Id.* at 518 (Black, J., dissenting); *see also J.S.*, 650 F.3d at 928–29 (discussing Justice Black's *Tinker* dissent).

Here, MASD's designees disavowed any expectation that B.L.'s Snap would cause disruption of any cheerleading or school activities. JA211–12. The undisputed facts demonstrate that there was no basis for the District to anticipate substantial, material disruption from the Snap. *Id.* The record likewise

demonstrates that no substantial, material disruption occurred.  JA208–11.  This case simply has no bearing on coaches' ability to control their practices and games because the Snap disrupted nothing.

MASD argues that the distaste B.L.'s fellow cheerleaders expressed for the Snap and resentment they harbored towards her as a result of the District Court's TRO restoring her to the team should qualify as "disruption" sufficient to satisfy *Tinker*.  But these rumblings are nothing different from the "discomfort and unpleasantness that always accompany an unpopular viewpoint." *Tinker*, 393 U.S. at 509.  And this Court has already rejected the notion that any disruption of school activities caused by a school district's response to speech—including ensuing litigation—is relevant to a *Tinker* disruption inquiry. *J.S.*, 650 F.3d at 929 n.6. The fact that some cheerleaders were displeased with the District Court's issuance of a temporary restraining order is irrelevant to a determination of whether B.L.'s Snap caused substantial, material disruption.

The lack of disruption reflected in the record sets this case apart from some of the out-of-circuit precedent MASD relies on in which courts upheld punishment for out-of-school speech that actually resulted in substantial, material disruption of school activities or led school officials to anticipate such disruption.  The Second Circuit's decision in *Doninger v. Niehoff*, 527 F.3d 41 (2d Cir. 2008), and the Sixth Circuit's decision in *Lowery v. Euverard*, 497 F.3d 584 (6th Cir. 2006), fall into

this category.  *See* MASD's Br. 13, 18, 19, 37; *Layshock*, 650 F.3d at 217

(distinguishing *Doninger*); *J.S.*, 650 F.3d at 929–30 (distinguishing *Doninger* and

*Lowery* based on lack of basis for anticipating disruption).  Thus, even if this Court

were inclined to agree with the Second Circuit that the permissibility of punishing

out-of-school speech depends on the "serious[ness]" of the punishment imposed,

*see Doninger,* 527 F.3d at 53, this case would still not come out the same way as

*Doninger*.  *See Layshock*, 650 F.3d at 217 (stating that *Doninger* "involved off

campus expressive conduct that resulted in a substantial disruption of the

school");[5] *Doninger*, 527 F.3 at 43 ("Because Avery's blog post created a

foreseeable risk of substantial disruption at LMHS, we conclude that the district

court did not abuse its discretion [in denying Avery a preliminary injunction].").

## IV.    THE HOLDINGS AND REASONING IN *J.S.* AND *LAYSHOCK* APPLY WITH EQUAL FORCE TO THIS CASE.

The Supreme Court has recognized a few narrow exceptions that allow

schools to restrict students' speech absent a showing of substantial, material

disruption.  *See Morse v. Frederick*, 551 U.S. 393, 396 (2007); *Hazelwood Sch.*

*Dist. v. Kulhmeier*, 484 U.S. 260, 270–73 (1988); *Bethel Sch. Dist. No. 403 v.*

*Fraser*, 478 U.S. 675, 685 (1986).  But none of the Supreme Court cases

---

[5]     This Court in *Layshock* was also careful to note that distinguishing *Doninger* on its facts should not be read to "suggest that we agree with that court's conclusion that the student's out of school expressive conduct was not protected by the First Amendment there."  *Layshock*, 650 F.3d at 218.

recognizing exceptions to *Tinker* allows schools to punish speech that takes place off-campus at a time when the student is not participating in school activities.

> ### A. This Court, Sitting En Banc, Has Already Held That the *Fraser* Exception to *Tinker* Does Not Apply Outside of School.

The Supreme Court in *Fraser* carved out an exception to *Tinker* that allows schools to punish students for using profanity or lewd language during school events without having to demonstrate that the speech poses a risk of substantial, material disruption. *Fraser*, 478 U.S. at 685.

The *Fraser* exception is a "narrow" one. *B.H.*, 725 F.3d at 304 (quoting *Saxe v. State Coll. Area Sch. Dist.*, 240 F.3d 200, 212 (3d Cir. 2001)). This Court has also ruled, sitting en banc, that "*Fraser* does not apply to off-campus speech," and held that a school could not rely on *Fraser* to justify punishing a student for "profane language outside the school, during non-school hours." *J.S.*, 650 F.3d at 932. Further, this Court's limitation of *Fraser* to speech that takes place during school activities is consistent with the Supreme Court's observation that, "had Fraser delivered the same speech in a public forum outside the school context, it would have been protected." *Morse*, 551 U.S. at 405.[6]

_____

[6] The Ninth Circuit has not held that *Fraser* applies to out-of-school speech, as MASD misleadingly suggests. MASD repeatedly cites *Chandler v. McMinnville School District*, 978 F.2d 524 (9th Cir. 1992), for the proposition that *Fraser* applies "without a showing that such speech occurred during a school-

Disregarding these decisions, MASD asks the Court to read *Fraser* broadly. MASD argues that "the Supreme Court held in *Fraser* that it was a proper purpose for school district[s] to 'inculcate the habits and manners of civility,'" and suggests that the *Fraser* standard, rather than *Tinker*, applies whenever a school punishes speech in an effort to teach students "civility." MASD's Br. 24 (quoting *Fraser*, 478 U.S. at 681).

As this Court observed in *Layshock*, "*Tinker* teaches that schools are not helpless to enforce the reasonable order necessary to accomplish their mission." *Layshock*, 650 F.3d at 221. As described in *Tinker* and its progeny, schools may punish student speech in furtherance of pedagogical goals when the speech causes substantial, material disruption or falls into one of the narrow categories of speech that schools may punish even absent disruption.

Under MASD's reading of *Fraser*, however, public schools could mete out punishment for a student's speech anytime, anywhere, irrespective of the students' parents' views of appropriate conduct and discipline. As the District Court

---

*Continued from previous page*

sponsored event[.]" MASD's Br. 14, 24, 26. But *Chandler* involved student speech that took place at school during the school day, and the Court analyzed the students' claims under *Tinker*, not *Fraser*. The Ninth Circuit held that schools could not punish students for wearing buttons to school during a teacher strike that said "I'm not listening, scab," "Do scabs bleed?" and "No scabs" without demonstrating that school officials reasonably forecasted that the buttons would result in substantial, material disruption. *Chandler,* 978 F.2d at 530.

observed, accepting MASD's arguments would allow schools to convert the school community into "Thought Police—reporting every profanity uttered—for the District." JA5.  This is more than the First Amendment permits.

> **B.** **There Is No Exception to *Tinker* That Would Allow Schools to Punish Speech Whenever the Punishment Advances a School's "Educational Mission."**

*Tinker* allows a public school to punish a student whose speech causes substantial disruption of school activities.  However, there is no exception to the First Amendment that allows a public school to censor a student's critical, unorthodox, or disfavored opinions, or punish the student for expressing such opinions, as part of a program to advance the school's educational mission when the speech is not disruptive.

The Court should resist MASD's invitation to recognize a new exception to the student speech doctrine to allow schools to punish students for out-of-school speech when the speech-punishing rule was "intended to further the educational mission of the school district[.]"  MASD's Br. 2.  Essentially, MASD asks this Court to presume that the *Tinker* disruption standard is satisfied whenever an athletic coach or extracurricular advisor decides that a student's out-of-school speech undermines "team morale," "chemistry," or "sportsmanship."  *Id.* 41–42.

No such exception exists under current law.  Indeed, Justice Alito wrote separately in *Morse* to state directly that the Court had not endorsed "the broad

argument advanced by [the government] that the First Amendment permits public school officials to censor any student speech that interferes with a school's 'educational mission.'" *Morse v. Frederick*, 551 U.S. 393, 423 (2007) (Alito, J., concurring).[7] This Court in *J.S.* likewise rejected the notion that schools can punish off-campus speech on the grounds that it interferes with the school's educational mission. *J.S.*, 650 F.3d at 932.

Additionally, a test that turned on a school's perception of what is necessary to further a school's "educational mission" would effectively vitiate all restraint on public schools' power to punish students. It would, in essence, create a presumption of constitutionality for all school discipline for student speech, inverting the constitutionally mandated burden of proof, which is supposed to rest with the government to justify its restriction on speech.[8]

---

[7] This Court in *B.H.* observed that Justice Alito's concurring opinion in *Morse* is controlling because his vote was needed to form a majority. *B.H.*, 725 F.3d at 309–13.

[8] Even assuming the Court were inclined to carve out a new exception to allow schools to enforce restrictions on speech that further a school's "educational mission," MASD has not proved any such connection here because the expert testimony that MASD sought to rely on as evidence of the "educational" purpose of the Cheerleading Rules is inadmissible. MASD sought to introduce the testimony of an educator and school administrator, Dr. Mussoline, on wide-ranging topics such as the difference between excluding students from school and excluding them from extracurricular activities, the typicality and reasonableness of MASD's Cheerleading Rules, the best way to foster positive qualities in student athletes, and how communities generally view cheerleading squads. *See* ECF 36-1

### C. The First Amendment's Restrictions on Schools' Power to Punish Students for Speech Are Not Limited to Punishment That Infringes on a Student's "Property Right."

MASD's emphasis on the fact that extracurricular activities are a "privilege," and that B.L. has no "property right" to participate in extracurricular activities, is misplaced. MASD's Br. 17–20. The distinction between educational opportunities that schools are required to provide to all students and "privileges" that schools need not make available has no bearing on this First Amendment case.[9]

This Court in *J.S.* and *Layshock* did not overturn those students' discipline because it violated J.S. and Layshock's "property right" to an education; it did so because punishing them for their out-of-school speech violated their First

---

*Continued from previous page*

at 1. As explained at length in B.L.'s memoranda of law in support of her motion to preclude Dr. Mussoline's expert testimony, none of his testimony is the product of a reliable—or even discernible—methodology, his opinions are irrelevant to the legal and factual issues in the case, and he is not qualified to offer expert testimony on many of the topics he addressed. *See* ECF 36; ECF 54. The District Court was justified in ignoring Dr. Mussoline's report as "immaterial." JA25.

[9] Many of the cases MASD relies on present procedural due process claims, where the notion of a "protected property interest" may have some relevance. *See, e.g., Lowery v. Euverard*, 497 F.3d 584, 588 (6th Cir. 2007); *Angstadt v. Midd-West Sch. Dist.*, 377 F.3d 338, 344 (3d Cir. 2004); *Delatorre v. Minn. State High Sch. League*, 202 F. Supp. 3d 1046 (D. Minn. 2016); *Scott v. Minn. State High Sch. League*, No. 16-cv-4148, 2016 WL 7735565 (D. Minn. Dec. 27, 2016). But, as the District Court observed, property interests do not have any significance in the First Amendment context. JA15–16.

Amendment rights to speak. Similarly, B.L. has not argued that she has a right to be a cheerleader, but rather, that she has the right to speak freely when she is not at school or participating in school activities without fear that she will be punished with suspension from the cheerleading team. MASD's suggestion that students' First Amendment rights are narrower when they are enjoying the "privilege" of participating in athletics is in direct conflict with the Supreme Court's observation in *Tinker* that students have First Amendment rights even "on the playing field," *Tinker*, 393 U.S. at 512–13, as well as decades of precedent prohibiting the government from retaliating against individuals for exercising their First Amendment rights, *see*, *e.g.*, *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274 (1977). It simply does not matter in this case that schools can exclude students from extracurricular activities for a wide range of reasons unrelated to their speech since students do not have a "right" to participate in extracurricular activities. As the District Court pointed out, even actions that the government could lawfully take for non-retaliatory reasons can become unlawful if done as punishment for speech. JA15–16; *see*, *e.g.*, *Anderson v. Davila*, 125 F.3d 148, 161 (3d Cir. 1997) (holding that even though the government may lawfully engage in certain forms of surveillance, it may not surveil someone in retaliation for their First Amendment activity).

Indeed, in none of the seminal student speech cases did the Supreme Court or this Court analyze the nature of the punishment before deciding whether a school's punishment of student speech violated the First Amendment. This Court has applied the framework set forth in *Tinker* and its progeny not only to punishment consisting of suspension or expulsion from class, but also to punishment consisting of removing school "privileges" such as participation in extracurricular activities,[10] attendance at graduation,[11] attendance at a school dance,[12] and in-school distribution of party invitations.[13]

First Amendment retaliation is one area of law in which courts do inquire into the gravity of the government's sanction to determine whether the First Amendment is implicated. But MASD does not dispute that its punishment of B.L. would more than suffice to implicate the First Amendment under a retaliation framework because expelling students from extracurricular activities as punishment for their speech is plainly a speech deterrent.

---

[10]  *Layshock,* 650 F.3d at 210 (stating that Layshock was "banned from all extracurricular activities, including Academic Games and foreign-language tutoring").

[11]  *Id.*

[12]  *J.S.*, 650 F.3d at 922; *B.H. ex rel. Hawk v. Easton Area Sch. Dist.*, 827 F. Supp. 2d 392, 393 (E.D. Pa. 2011), *aff'd*, 725 F.3d 293 (3d Cir. 2013) (en banc).

[13]  *K.A. v. Pocono Mountain Sch. Dist.*, 710 F.3d 99, 102–05 (3d Cir. 2013).

To prevail on a claim for First Amendment retaliation, a speaker must prove (1) that they engaged in speech or conduct protected by the First Amendment, (2) that the government took a "retaliatory action sufficient to deter a person of ordinary firmness from exercising his constitutional rights," and (3) a causal link between the constitutionally protected conduct and the retaliatory action. *E.g.*, *Thomas v. Indep. Twp.*, 463 F.3d 285, 296 (3d Cir. 2006). As the District Court noted, some courts have invoked First Amendment retaliation standards in student speech cases, although this Circuit has not done so consistently. JA12 (citing *Monn v. Gettysburg Area Sch. Dist.*, 553 F. App'x 120, 122 (3d Cir. 2014); *Pinard v. Clatskanie Sch. Dist. 6J*, 467 F.3d 755, 770 (9th Cir. 2006); *J.S.*, 650 F.3d at 928–33)). *Compare Feldman v. Cmty. Coll. of Allegheny*, 85 F. App'x 821, 824–25 (3d Cir. 2004) (applying retaliation framework to student's claim that school ejected him from the property and called the police because of his statements accusing school officials of discrimination), *with Layshock*, 650 F.3d at 211–19 (analyzing student's claim that school suspended him and imposed other sanctions because he made an offensive MySpace profile of principal without applying retaliation framework).

But the outcome in this case will be the same regardless of whether the Court applies the retaliation framework. As the District Court explained, courts have held that even "minor discipline" suffices to deter a person of ordinary

firmness from exercising their free speech rights. JA17–18. Removing B.L. from the cheerleading team for an entire year clearly surpasses that minimal threshold. Indeed, MASD has conceded that kicking B.L. off the cheerleading squad for an entire year would be sufficient to deter a person of ordinary firmness from exercising her constitutional rights. *See* MASD's Br. at 24 n.2 (conceding that B.L. was "punished" within the meaning of the second prong and that there was a causal link between B.L.'s speech and her punishment).

The District would have been hard-pressed to argue otherwise. The whole purpose and design of MASD's punishment of B.L. was to deter B.L. and other students from exercising their right to engage in the same type of speech.

In sum, there is no principled First Amendment basis for distinguishing between punishment consisting of expulsion or suspension from class and the punishment here.

### D.    Cheerleaders Are Students, Not School Employees.

Equally meritless is MASD's argument that, because students in extracurricular activities "represent their schools much in the way that government employees represent their employer," cheerleaders' First Amendment rights should be analyzed like those of government employees, rather than school students. MASD's Br. 30; *see also id.* 28–30. As MASD notes, the government "has

significantly greater leeway" to restrict the speech of government employees than it does to regulate speech generally. *Id.* at 28.

There is no authority for the proposition that schools can regulate students' out-of-school speech as if they were employees when they are engaged in extracurricular activities. Indeed, the *Tinker* Court observed that students have First Amendment rights not just when they are in class, but when they are representing their schools "on the playing field" as well. *Tinker*, 393 U.S. at 512–13. And in any event, MASD's designees conceded that there was no factual basis for treating cheerleaders differently from students who participate in other activities. JA274.[14]

### E. The Cases MASD Relies on Are All Distinguishable.

Only a few of the sixty-five cases MASD cites are First Amendment cases involving students punished for their speech.

---

[14]  Moreover, MASD's suggestion that its relationship to its cheerleaders is closer to that of an employer/employee relationship than an educator/student relationship is in direct conflict with MASD's argument that enforcing the Cheerleading Rules advances MASD's "educational mission" by teaching cheerleaders important life skills—a topic on which MASD offered testimony by a proposed expert witness. MASD's Br. at 22–23.

Of the handful of school speech cases that MASD cites, most deal with speech that occurred *during school events*.  For example, MASD devotes a full page of its brief to quoting *Knotts v. Oregon Trail School District 46*, No. 15-cv-2296, 2017 WL 4861521 (D. Ore. Oct. 26, 2017).  MASD's Br. 25–26.  *Knotts* involved a First Amendment retaliation claim brought by "a frequent spectator at Sandy High School athletic events"—not a student—who was excluded from two athletic events because of "abusive" and profane comments he made to school staff, including several comments made *at school events*.  2017 WL 4861521, at *1, *12.[15]  But the case at bar is not about a school's power to punish disrespectful, defiant, or profane speech during school events; it is about whether schools have the authority to punish such speech when it occurs wholly outside of school and school-sponsored activities.

The difference is vital.  As the Second Circuit cogently explained in one of the cases MASD cites:

---

[15]     MASD also cites *Stokey v. North Canton School District*, 18-cv-1011, 2018 U.S. Dist. LEXIS 81778 (N.D. Ohio May 15, 2018), which involved a school district's decision not to allow a student to compete in polevaulting after the student "advised the coaching staff that he would not vault in the rain and that he would not follow any coaching instruction that contradicted the instructions he received at his private club." *Id.* at *22.  In finding that the student had not demonstrated a likelihood of success on the merits of his First Amendment claim, the Court held that "it is unlikely that dismissing an athlete who refused to practice on account of his own personal assessment that the conditions were unsafe would run afoul of the First Amendment." *Id.* at *18.

> [O]ur willingness to defer to the schoolmaster's expertise
> in administering school discipline rests, in large measure,
> upon the supposition that the arm of authority does not
> reach beyond the schoolhouse gate.  When an educator
> seeks to extend his dominion beyond these bounds, . . .
> he must answer to the same constitutional commands that
> bind all other institutions of government.

*Thomas v. Bd. of Educ.*, 607 F.2d 1043, 1044–45 (2d Cir. 1979), *cited in* MASD's

Br. 33; *see also Layshock*, 650 F.3d at 219 (quoting *Thomas*, 607 F.3d at 1045).

Nor is MASD's invocation of *Johnson v. Cache County School District*

persuasive.  *See* MASD's Br. 13 (citing *Johnson v. Cache Cty. Sch. Dist.*, 323 F.

Supp. 3d 1301 (D. Utah 2018)).  The basis for punishment in *Johnson* was the

cheerleaders' violation of their coaches' narrow, 24-hour prohibition on

publicizing the fact of their selection to the cheerleading team prior to the

announcement at the school assembly the following day, which the coaches had

asked for in order to "provide a small buffer of time for students to deal with not

making the team."  *Johnson*, 323 F. Supp. 3d at 1319.  The plaintiff in *Johnson* had

posted a video to Snapchat showing herself and her fellow cheerleaders wearing

cheer T-shirts they had just received for making the squad, in violation of the

temporary prohibition on social media posts publicizing their selection.  *Id.* at

1309.  As the *Johnson* court acknowledged when distinguishing the District

Court's decision in this case, "B.L. did not involve a specific situation where

students were asked by a coach and school officials not to post a certain message for a limited period of time." *Id.* at 1320.

Although the *Johnson* court placed great weight on the distinction between removal from class and removal from extracurricular activities, that distinction is neither persuasive nor the law of this Circuit. The *Johnson* court's analysis conflicts with this Court's authoritative analysis in *Layshock*, which drew no distinction between Layshock's removal from class and his removal from extracurricular activities and his graduation ceremony. *Layshock,* 650 F.3d at 210.

The cases MASD cites involving student drug and alcohol use are likewise irrelevant to this appeal. MASD extensively quotes *Vernonia School District v. Acton*, 515 U.S. 646 (1995), a case that held that it does not violate the Fourth Amendment for schools to conduct suspicionless drug tests of student athletes, as well as other Fourth Amendment cases.[16] MASD's reliance on cases involving student drug use is misplaced.[17]

---

[16]     *See* MASD's Br. at 13–15, 19, 23 (citing *Vernonia*); MASD's Br. 13 (citing *Ziegler v. Martin Vty. Sch. Dist.*, 831 F.3d 1309 (11th Cir. 2016) (Fourth Amendment case involving breathalyzer at prom)); MASD's Br. 19 (citing *Schaill v. Tippecanoe Cty. Sch. Corp.*, 679 F. Supp. 833 (N.D. Ind. 1988) (Fourth Amendment drug-testing case)); MASD's Br. 33 (citing *New Jersey v. T.L.O.*, 469 U.S. 325 (1985) (Fourth Amendment case involving search for cigarettes)).

[17]     MASD and its amici also cite a number of other nonbinding, non-First Amendment cases brought by students removed from extracurricular activities because of their drug or alcohol use who claimed the punishment violated their due

Determining whether a particular search violates the Fourth Amendment's prohibition on "unreasonable" searches and seizures involves balancing the individual's expectation of privacy against the government's legitimate interests. *E.g.*, *Vernonia*, 515 U.S. at 654. The outcome of this balancing turns in large part on the government's significant interest in detecting drug use by student athletes, driven by safety concerns. *Id.* at 662. As the Supreme Court explained, "the risk of immediate physical harm to the drug user or those with whom he is playing his sport is particularly high." *Id*. The Supreme Court in *Vernonia* held that student athletes have diminished expectations of privacy because they participate in a highly regulated activity. *Id*. at 657. The Court concluded that the state's interest in safety outweighed the students' minimal privacy interests implicated by urinalysis, and that the drug testing policy was thus "reasonable" within the meaning of the Fourth Amendment. *Id.* at 664–65.

But the balance the Fourth Amendment strikes between students' privacy and schools' interest in safety has no bearing on whether the First Amendment

---

*Continued from previous page*

process or state law rights. *See, e.g.*, MASD's Br. at 16, 18 (citing *D.N. v. Penn Harris Madison Sch. Corp.*, No. 05-cv-716RM, 2006 WL 2710596 (N.D. Ind. Sept. 18, 2006); *King v. Hempfield Sch. Dist.*, 8 Pa. D. & C. 4th 48 (Lancaster Ct. Com. Pl. 1990; *Billman v. Big Spring Sch. Dist.*, 27 Pa. D. & C. 3d 488 (Cumberland Ct. Com. Pl. 1983); *Delisio v. Ellwood City Area Sch. Dist.*, 70 Pa. D. & C. 2d 524 (Lawrence Ct. Com. Pl. 1975)).

permits schools to punish student athletes for speech that school officials dislike. The First Amendment standards set forth in *Tinker* and its progeny are not balancing tests.

### V.    B.L. DID NOT WAIVE HER FIRST AMENDMENT RIGHTS, NOR COULD MASD REQUIRE HER TO WAIVE HER FIRST AMENDMENT RIGHTS, IN ORDER TO PARTICIPATE IN CHEERLEADING.

The District Court correctly determined that B.L. did not waive her First Amendment rights merely by becoming a cheerleader or signing a general acknowledgement of the Cheerleading Rules.  Referring to the issue as "argumentative brush," the District Court explained that MASD failed to adduce clear and compelling evidence to show that B.L. ever voluntarily and knowingly waived her First Amendment rights.  JA13–14.  Waivers of constitutional rights are only effective if they are "knowing" and "voluntary."  *Erie Telecomms., Inc. v. City of Erie*, 853 F.2d 1084, 1099 (3d Cir. 1988); *Johnson v. Zerbst*, 304 U.S 458, 464 (1938).  In this case, the record contains no evidence that anyone informed B.L. that she would be waiving any legal rights—let alone her First Amendment right to speak freely on her own time—by joining the cheerleading team.  The District Court correctly found that B.L. did not knowingly and voluntarily waive her First Amendment rights.  JA13–14.

The District Court also observed that MASD could not constitutionally coerce B.L. into waiving her First Amendment rights in order to participate in cheerleading.  Even when a waiver is knowing and voluntary, the Supreme Court has recognized additional limits on the government's ability to condition a government benefit or contract upon the relinquishment of First Amendment rights.  *Board of Cty. Commn'rs v. Umbehr*, 518 U.S. 668, 674 (1996); *see also Rumsfeld v. FAIR, Inc.,* 547 U.S. 47, 59 (2006).  Although the government may choose which speech it wishes to subsidize and thus may impose speech-related restrictions on the use of government funds, the government may not leverage its provision of benefits in order to restrict the recipient's speech outside of the government-funded program.  *See Agency for Int'l Dev. v. Alliance for Open Society Int'l*, 570 U.S. 205, 214–15 (2013).  For example, the Supreme Court has held that the government violated the First Amendment when it required all grant recipients to adopt a platform opposing the legalization of sex work as a condition of receiving government funding.  *Id.* at 218–19.

Requiring cheerleaders to give up their free speech rights outside of school as a condition of exercising the "privilege" of participating in cheerleading runs afoul of this "unconstitutional conditions doctrine."  Prohibiting cheerleaders from using language or espousing views that are distasteful to school officials even when they are not at school or engaged in cheerleading is coercive and analogous

to the impermissible platform requirement struck down in *Agency for International Development.* Thus, even if B.L. had knowingly and voluntarily waived her First Amendment rights when she signed up for cheerleading, the requirement that she do so would have been an unenforceable, unconstitutional condition.

## VI.    THE RULES MASD APPLIED TO PUNISH B.L. ARE FACIALLY UNCONSTITUTIONAL.

Even if schools did have the power to suspend students from extracurricular activities as punishment for their out-of-school speech, the Court could affirm the judgment below on the alternative ground that the rules MASD invoked to punish B.L. are facially unconstitutional.[18] Rules that discriminate based on viewpoint or are so vague as to be incapable of reasoned application are facially unconstitutional and invalid as applied to everyone, whether or not the government could adopt a different, facially constitutional rule prohibiting the speech at issue. *Iancu v. Brunetti*, 139 S. Ct. 2294, 2302 (2019) (viewpoint discriminatory laws are facially unconstitutional); *Minn. Voters Alliance v. Mansky*, 138 S. Ct. 1876, 1885, 1892 (2018) (law that was so vague as to be not "capable of reasoned application" was facially unconstitutional).

---

[18]    B.L. raised this issue below, but the District Court did not need to decide it. ECF 34 at 15–19; ECF 53 at 13–16; JA24–25.

### A. MASD's Rules Are So Vague That They Impermissibly Vest School Officials With Unbridled Discretion to Censor Speech.

The First Amendment requires regulations of speech to be sufficiently clear and definite that they do not vest officials with virtually "unbridled discretion" to decide "who may speak and who may not based upon the content of the speech or the viewpoint of the speaker." *City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 763 (1988).[19] Vague restrictions on speech are especially problematic when they are also broad; the "very existence" of such overbroad regulations can inhibit free expression. *Saxe*, 240 F.3d at 214 (quoting *Members of City Council v. Taxpayers for Vincent*, 466 U.S. 789, 799 (1984)); *Sypniewski v. Warren Hills Reg'l Bd. of Educ.*, 307 F.3d 243, 258–59 (3d Cir. 2002). Vague and overbroad prohibitions on speech also pose a risk of viewpoint discrimination. "It is 'self-evident' that an indeterminate prohibition carries with it '[t]he opportunity for

---

[19]     *See also, e.g.*, *Metromedia, Inc. v. City of San Diego*, 453 U.S. 490, 537–38 (1981) (Brennan, J., concurring) (observing that according "wide discretion" to government officials to "control the free exercise of First Amendment rights is precisely what has consistently troubled this Court in a long line of cases") (collecting cases); *Se. Promotions, Ltd. v. Conrad*, 420 U.S. 546, 553 (1975) ("the danger of censorship and of abridgement of our precious First Amendment freedoms is too great where officials have unbridled discretion over a forum's use"); *Sypniewski v. Warren Hills Reg'l Bd. of Educ.*, 307 F.3d 243, 266 (3d Cir. 2002) (indeterminate, content-based regulation of speech "'may authorize an even encourage arbitrary and discriminatory enforcement' by failing to 'establish minimal guidelines to govern . . . enforcement'" (quoting *City of Chicago v. Morales*, 527 U.S. 41, 56 (1999); *Kolender v. Lawson*, 461 U.S. 352, 358 (1983))).

abuse, especially where [it] has received a virtually open-ended interpretation."

*Minnesota Voters Alliance*, 138 S. Ct. at 1891 (quoting *Bd. of Airport Comm'rs of City of L.A. v. Jews for Jesus, Inc.*, 482 U.S. 569, 576 (1987)).

The record demonstrates that the cheerleading and handbook rules that MASD invoked as a basis for punishing B.L. are vague and extremely broad. Whether speech is prohibited under these rules turns entirely on a particular government official's whims. There is no discernible logic to the cheerleading coaches' conclusion that saying "I don't really like cheerleading that much anymore" would violate the prohibition on publishing "negative information" about cheerleading, but saying that cheerleaders are at high risk for eating disorders, or criticizing the cheerleading selection process, would not constitute "negative information" about cheerleading. As for the "respect" provision, whether an out-of-school statement violates it has little to do with the words of the rule and much more to do with the cheerleading coaches' subjective view of what is disrespectful and unbecoming of cheerleaders. To B.L.'s cheer coaches, off-campus profanity does not violate the "respect" rule if it does not reference cheerleading. But all off-campus profanity violates the "respect" rule if used in reference to cheerleading, even if the sentiment expressed is an exuberant, positive one like "cheerleading is fucking awesome." JA19. Indeed, the coaches essentially conceded that the rules turn on their own subjective and ad hoc views,

explaining that they apply the rules on a "case by case basis" based on how the coaches "feel." JA170–71.

The "personal conduct" rule of the student handbook fares no better. It prohibits conduct—and, according to MASD, out-of-school speech—that school officials believe would "tarnish" the "image" of the district, or "reflect a discredit" upon the student or school. JA486. This is an inherently subjective exercise that is made even more indeterminate by the fact that it requires school officials to speculate about how other people would react to the speech.

In sum, these rules are facially unconstitutional because they are so indefinite that they can be "stretched or contracted" at will to punish or permit almost any conceivable student statement as the cheer coaches see fit. *See Gregoire v. Centennial Sch. Dist.*, 907 F.2d 1366, 1374 (3d Cir. 1990). There is simply nothing in the text of these rules that makes clear what speech is permissible and what is not. As the Supreme Court has observed, "one man's vulgarity is another man's lyric." *Cohen v. California*, 403 U.S. 15, 25 (1971). The First Amendment does not permit the government to adopt amorphous rules that allow officials an untrammeled ability to censor speech based on their personal caprices.

## B.    The Cheerleading Rules Are Facially Viewpoint Discriminatory.

The rules that MASD invoked as a basis for punishing B.L. are also facially unconstitutional because they are viewpoint discriminatory.

It is axiomatic that the government may not, consistent with the First Amendment, prohibit the expression of certain disfavored viewpoints.  The idea that the government "has an interest in preventing speech expressing ideas that offend" is an idea that "strikes at the heart of the First Amendment."  *Matal v. Tam*, 137 S. Ct. 1744, 1764–65 (2017).  Viewpoint discrimination is an "egregious form of content discrimination" and "presumptively unconstitutional." *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829–30 (1995).  A regulation of speech discriminates based on viewpoint if it allows only some views on particular subjects, *Pittsburgh League of Young Voters Educ. Fund v. Port Auth.*, 653 F.3d 290, 296, 298–99 (3d Cir. 2011), or if it prohibits speech because it is deemed controversial or offensive, *Child Evangelism Fellowship v. Stafford Twp. Sch. Dist.*, 386 F.3d 514, 527 (3d Cir. 2004).

Courts have recognized some permissible viewpoint discrimination in a school setting.  In *Morse v. Frederick*, the Supreme Court held that schools may punish students for speech during school activities that a reasonable observer would interpret as advocating illegal drug use, even absent a showing of

substantial, material disruption, and even though students were permitted to advocate *against* illegal drug use. *See Morse*, 551 U.S. at 396. But *Morse* involved speech that took place at a "school-sanctioned and school-supervised event" during the school day. *Id.* Neither this Court nor the Supreme Court has suggested that schools have the power to punish students' drug advocacy when it occurs outside of school.

When students are not at school, they retain their full First Amendment rights. And government restrictions on speech such as the Cheerleading Rules and handbook provision that the school invoked to punish B.L. would unquestionably be unconstitutional in a non-school setting because, on their face, they discriminate based on viewpoint.

It is the "essence of viewpoint discrimination" for the government to allow speech that is "positive," but not speech that is "derogatory." *Iancu v. Brunetti*, 139 S. Ct. 2294, 2299 (2019) (quoting *Matal*, 137 S. Ct. at 1766 (Kennedy, J., concurring)). Thus, the Supreme Court invalidated an anti-disparagement provision that precluded trademark owners from registering marks that disparaged any group of people, but permitted non-disparaging marks. *Matal*, 137 S. Ct. at 1763. Likewise, in *Iancu*, the Supreme Court invalidated a provision that precluded trademark owners from registering "immoral or scandalous" marks, but

permitted marks that the government deemed moral, and not scandalous. *Iancu*, 139 S. Ct. at 2299–2302.

The "respect," "negative information," and "personal conduct" rules are viewpoint discriminatory for the same reason that the anti-disparagement rule at issue in *Matal* and the "immoral or scandalous" rule at issue in *Iancu* were: they allow cheerleaders to express respectful sentiments but not disrespectful ones, to convey positive information but not negative information, and to engage in speech that enhances the school's image, but not speech that discredits the school. As this Court has explained, censoring speech because some people may take issue with the viewpoint is viewpoint discrimination. *Child Evangelism Fellowship*, 386 F.3d at 527.

In sum, the fact that MASD's rules would be facially unconstitutional in any other setting because they vest officials with unbridled discretion and discriminate based on viewpoint is an additional reason for the Court to affirm the decision below. The Court should reject MASD's invitation to create new authority for schools to punish students for expressing views the school dislikes.

## CONCLUSION

For the foregoing reasons, MASD violated B.L.'s First Amendment free speech rights and cannot meet its burden to justifying its punishment of B.L. Accordingly, the decision of the District Court should be affirmed.

Respectfully submitted,

Dated:  August 21, 2019          ACLU OF PENNSYLVANIA

By:  */s/ Molly Tack-Hooper*
Molly Tack-Hooper (PA ID No. 307828)
Sara J. Rose (PA ID No. 204936)
Witold J. Walczak (PA ID No. 62976)
P.O. Box 60173
Philadelphia, PA 19102
(215) 592-1513 x 113
mtack-hooper@aclupa.org

SCHNADER HARRISON SEGAL & LEWIS LLP
By:  */s/ Arleigh P. Helfer III*

Arleigh P. Helfer III (PA ID No. 84427)
Theresa E. Loscalzo (PA ID No. 52031)
1600 Market Street, Suite 3600
Philadelphia, PA 19103
(215) 751-2430
ahelfer@schnader.com

*Counsel for Plaintiff-Appellee B.L.*

# COMBINED CERTIFICATIONS

I hereby certify that:

1.     At least one of the attorneys whose names appear on the foregoing brief, including the undersigned, is a member of the bar of this Court, as required by Local Rule 28.3(d).

2.     This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 11,344 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f).

3.     This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this brief has been prepared in a proportionately spaced typeface using Microsoft Word in Times New Roman 14-point font.

4.     The text of the electronic versions of this Brief and Joint Appendix filed on ECF are identical to the text of the paper copies filed with the Court.

5. The electronic versions of the Brief and Joint Appendix filed on ECF were virus checked using Webroot SecureAnywhere, and no virus was detected.


Dated: August 21, 2019       */s/ Arleigh P. Helfer III*
                                Arleigh P. Helfer III (PA ID No. 84427)
                                1600 Market Street, Suite 3600
                                Philadelphia, PA 19103
                                (215) 751-2430
                                ahelfer@schnader.com

                                *Counsel for Plaintiff-Appellee B.L.*

## CERTIFICATE OF SERVICE

I, Arleigh P. Helfer III, certify that I caused the foregoing brief to be served on counsel of record for appellant via the Court's electronic case filing system, where the brief is available for viewing and downloading.

/s/ Arleigh P. Helfer III
Arleigh P. Helfer III (PA ID No. 84427)
1600 Market Street, Suite 3600
Philadelphia, PA 19103
(215) 751-2430
ahelfer@schnader.com

*Counsel for Plaintiff-Appellee B.L.*