# United States Court of Appeals
*for the*
# Third Circuit

Case No. 19-1842

B.L., a minor, by her father, LAWRENCE LEVY,
and her mother, BETTY LOU LEVY,

*Appellees,*

v.

MAHANOY AREA SCHOOL DISTRICT,

*Appellant.*

Appeal from an Order granting Appellees' Motion for Summary Judgment entered in the United States District Court for the Middle District of Pennsylvania

## REPLY BRIEF OF APPELLANT

Michael I. Levin, Esq.
David W. Brown, Esq.
LEVIN LEGAL GROUP, P.C.
1800 Byberry Road, Suite 1301
Huntingdon Valley, PA 19006
Phone: (215) 938-6378

*Attorneys for Appellant*

# TABLE OF CONTENTS

Table of Authorities ... iii

I. ARGUMENT ... 1
  A. Introduction ... 1
  B. Profane Speech Is Not Protected When Aimed at Minors ... 2
  C. Other Circuits Have Held That Disruption of an Extracurricular Team's Cohesion Meets the *Tinker* Standard ... 5
  D. *J.S* and *Layshock* Did Not Address Key Issues That Make This Case Distinguishable ... 9
  E. The Cheerleading Rules Are Not Unconstitutional ... 18
  F. Addressing Arguments of Amicus Curiae Foundation for Individual Rights in Education ... 19
  G. Addressing Arguments of Additional Amici ... 21
II. CONCLUSION ... 23

Certificate of Compliance ... iv

Certificate of Bar Membership ... v

Certificate of Service ... vi

Certificate of Identical Compliance of Briefs ... vii

Certificate of Anti-Virus Detection Program Use ... viii

# TABLE OF AUTHORITIES

Cases

*Baker v. Downey City Board of Educ.*, 307 F. Supp. 517 (C.D. Cal. 1969) ..........13
*Boucher v. School District of Greenfield*, 134 F.3d 821 (7th Cir. 1998) ...............13
*Bystrom v. Fridley High School*, 686 F. Supp. 1387 (D. Minn. 1987)...................13
*Chandler v. McMinnville School Dist.*, 978 F.2d 524 (9th Cir. 1992) ...................12
*Cohen v. California*, 403 U.S. 15 (1971)....................................................... 3, 4, 10
*Commonwealth v. Knox*, 190 A.3d 1146 (Pa. 2018) ..............................................13
*Doninger v. Niehoff*, 527 F.3d 41 (2d Cir. 2008)............................................. 5, 7, 8
*Federal Communications Commission v. Pacifica Foundation*, 438 U.S. 726 (1978)..........................................................................................................3
*Fenton v. Stear*, 423 F.Supp. 767 (W.D. Pa. 1976)................................................14
*Fraternal Order of Police, Lodge No. 5 v. City of Phila.*, 812 F.2d 105 (3d Cir. 1987)........................................................................................................20
*Ginsberg v. New York*, 390 U.S. 629 (1968) ............................................................3
*Hazelwood v. Kuhlmeier*, 484 U.S. 260 (1988).......................................................7
*J.C. ex rel. R.C. v. Beverly Hills Unified Sch. Dist.*, 711 F. Supp. 2d 1094 (C.D. Cal. 2010) .............................................................................................22
*J.S. ex rel. H.S. v. Bethlehem Area School Dist.*, 807 A.2d 847 (Pa. 2002)...........13
*Johnson v. Cache County School Dist.*, 323 F. Supp. 3d 1301 (D. Utah 2018)17, 18
*Killion v. Franklin Reg'l Sch. Dist.*, 136 F. Supp. 2d 446 (W.D. Pa. 2001)...........22
*Kowalski v. Berkeley County Schools*, 652 F.3d 565 (4th Cir. 2011) ........ 14, 15, 16
*Layshock ex rel. Layshock v. Hermitage School Dist.*, 650 F.3d 205 (3d Cir. 2011) ....................................................................................... ii, 9, 11, 22
*Lowery v. Euverard*, 497 F.3d 584 (6th Cir. 2007) ...........................................7, 8
*Pangle v. Bend–Lapine School Dist.*, 10 P.3d 275 (Ore. 2000) ..............................13
*Wisniewski v. Bd. of Educ. of the Weedsport Cent. Sch. Dist.*, 494 F.3d 34 (2d Cir.2007)....................................................................................................22

**Other Authorities**

First Amendment to the U.S. Constitution .................................................... passim

# I. ARGUMENT

## A. Introduction

Fifty years ago, the U.S. Supreme Court held that an Iowa school district could not prevent students from wearing black armbands as a silent political protest against the war in Vietnam absent a showing of a threat of substantial disruption to school activities. *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503 (1969). In the ensuing years, the high court announced some exceptions to the standard announced in *Tinker*, holding that in a school setting the First Amendment does not protect certain speech, including obscene speech and speech advocating drug use, and that schools can regulate school-sponsored speech.

In 2011, this Court decided two cases addressing students' First Amendment rights with respect to off-campus speech – *J.S. ex rel. Snyder v. Blue Mountain School Dist.*, 650 F.3d 915 (3d Cir. 2011) and *Layshock ex rel. Layshock v. Hermitage School Dist.*, 650 F.3d 205 (3d Cir. 2011). In both cases, the Court ultimately held that students' mocking of school officials was protected and that students could not be suspended from school because even if the *Tinker* standard were applied, there was no reasonable likelihood of substantial disruption. Yet at that time the members of the Court began questioning what constitutes "on-campus" and "off-campus" speech in an era of smart phones, instant messaging, Facebook, Instagram, and Snapchat.

In 2017, B.L., a student in the Mahanoy Area School District (the "School District"), posted a "Snap" message on Snapchat showing her and a friend holding up their middle fingers. The photo was accompanied by the text: "fuck school fuck softball fuck cheer fuck everything." J.A. 36, 477, 484. In the recently filed Brief of Appellees, B.L. asks this Court to find that her actions were protected by the First Amendment, effectively granting the "fuck school" Snap the same protection as the political protest in *Tinker*. B.L. argues that the decisions in *J.S.* and *Layshock* require the Court to find in her favor. However, as will be explained, the Appellees ignore several important factors distinguishing this case from *J.S.* and *Layshock*, including that B.L. was not suspended from school but was merely suspended from an extracurricular activity, that B.L.'s speech was clearly directed at the school community, and that courts have always aimed to protect minors from profane speech.

**B. Profane Speech Is Not Protected When Aimed at Minors**

B.L.'s counsel claims that her actions in posting the "fuck cheer" Snap were protected by the First Amendment because the Snap included "both pure speech and expressive conduct" and because it allegedly does not fall into any category of unprotected speech, such as fighting words.[1] Appellees' Brf., pp. 17-22. Yet they

---

[1] At least one Pennsylvania federal court has stated that giving the middle finger might not be protected by the First Amendment under the fighting words

ignore the fact that school students do not enjoy the same free speech protections as citizens at large. Instead Appellees attempt to support their position by simply pointing out that instances in which profanity use has been deemed protected. For example, the words "fuck the draft" were deemed protected when worn on a jacket at a courthouse during the Vietnam War. *Id.*, p. 20 (*citing Cohen v. California*, 403 U.S. 15, 20 (1971)).

However, it is clear that speech that is indecent – though not obscene – can be regulated in certain circumstances, especially when the intended audience is minors, including high school students. *Federal Communications Commission v. Pacifica Foundation*, 438 U.S. 726 (1978) (holding that it is a legitimate governmental interest to regulate indecent language easily accessible to minors); *see also Ginsberg v. New York*, 390 U.S. 629 (1968).

> [T]he element of choice on the part of the viewing or listening public, so central to the reasoning in *Cohen*, has not been considered to be sufficiently present where juvenile audiences are involved. When, as in this case, the audience at which a publication is specifically directed consists solely of high school students . . . First Amendment protection is not available for language that is indisputably indecent. If the FCC can act to keep indecent language off the afternoon airwaves, a school can act to keep indecent language from circulating on high school grounds.
>
> . . .
>
> [W]hatever the risk in the context of adult communication, it does not warrant an interpretation of the First Amendment that forbids school authorities from trying to regulate the distribution of indecent

---

exception in certain contexts. *Brockway v. Shepherd*, 942 F. Supp. 1012, 1016-17 (M.D. Pa. 1996).

> language to its students. Nor does the validity of such regulation depend on whether the use of such language will predictably lead to disruption. School authorities can regulate indecent language because its circulation on school grounds undermines their responsibility to try to promote standards of decency and civility among school children. The task may be difficult, perhaps unlikely ever to be more than marginally successful. But whether a school condemns or tolerates indecent language within its sphere of authority will have significance for the future of that school and of its students. The First Amendment does not prevent a school's reasonable efforts toward the maintenance of campus standards of civility and decency. With its captive audience of children, many of whom, along with their parents, legitimately expect reasonable regulation, a school need not capitulate to a student's preference for vulgar expression. A school's authority to condemn indecent language is not inconsistent with a student's right to express his views. ***In short, the First Amendment gives a high school student the classroom right to wear Tinker's armband, but not Cohen's jacket.***

*Thomas v. Board of Education, Granville Central School Dist.*, 607 F.2d 1043, 1057 (2d Cir. 1979) (opinion concurring in result) (citations omitted) (emphasis added).

In this case, B.L. used vulgar language and an obscene expression in her communication that was clearly aimed at an audience primarily made up of Mahanoy Area High School ("MAHS") students in order to express her displeasure at failing to make the varsity cheerleading team. At the very least, it is clear that if B.L. had said "fuck cheer" or given the middle finger to her coaches and teammates while in school, those actions would not have been protected by the First Amendment. The only question remaining is whether the fact that the actions were done off school grounds and outside school hours changes the analysis. Yet

it is clear that there is no blanket protection for B.L.'s use of profanity as the Appellees suggest.

As will be addressed below, the fact that B.L. posted the Snap while physically off-campus does not prevent the School District from disciplining her under *Tinker* and/or *Fraser*[2] where her speech was targeted at the school community. *See* Section I.D.1., *infra*.

### C. Other Circuits Have Held That Disruption of an Extracurricular Team's Cohesion Meets the *Tinker* Standard

B.L. next argues that the District impermissibly disciplined her because there was no substantial disruption to school activities meeting the *Tinker* standard. Appellees' Brf., pp. 22-24. However, Appellees fail to effectively respond to the School District's argument that a different standard applies to discipline involving only participation in extracurricular activities and not suspension or expulsion from school. Appellant's Brf., pp. 14-20. While recognizing that the Second Circuit and Sixth Circuit Courts of Appeals have held that schools can discipline students for out-of-school speech related to extracurricular activities, Appellees attempt to distinguish those cases by stating that the courts in those cases recognized a potential for substantial disruption under the *Tinker* analysis. Appellees' Brf., pp. 24-25.

---

[2] In *Bethel Sch. Dist. No. 403 v. Fraser*, 478 U.S. 675 (1986), the Supreme Court created an exception to Tinker by holding that schools need not permit obscene language even when there is no likelihood of substantial disruption.

However, a review of the facts in those cases regarding "substantial disruption" is instructive. In *Doninger v. Niehoff*, four high school students in Connecticut sent an e-mail to numerous people complaining that their school would not allow the annual battle of the bands called "Jamfest" in the school auditorium because the teacher responsible for operating the sound and lighting system was unavailable. 527 F.3d 41, 44-45 (2d Cir. 2008). After receiving numerous inquiries and complaints, the school told one student that the e-mail had contained inaccurate information and that a corrected e-mail should be sent. *Id.* Instead, the student created a public blog post stating that the school was cancelling Jamfest and encouraging students to contact the district superintendent "if you want to write something or call her to piss her off more." *Id.* When district officials learned of the blog post, they disciplined the student by not allowing her to run for senior class secretary. *Id.* at 46. The student sued, alleging, *inter alia*, a breach of her First Amendment rights. The court held that there was potential substantial disruption not only to school administrators handling calls from the public, but also to values associated with the extracurricular activity of student government.

> Finally, the district court correctly determined that it is of no small significance that the discipline here related to Avery's extracurricular role as a student government leader. The district court found this significant in part because participation in voluntary, extracurricular activities is a "privilege" that can be rescinded when students fail to comply with the obligations inherent in the activities themselves. We

> consider the relevance of this factor instead in the context of *Tinker* and its recognition that student expression may legitimately be regulated when school officials reasonably conclude that it will "materially and substantially disrupt the work and discipline of the school." More specifically, Avery's conduct risked not only disruption of efforts to settle the Jamfest dispute, but also frustration of the proper operation of LMHS's student government and undermining of the values that student government, as an extracurricular activity, is designed to promote.

*Doninger v. Niehoff*, 527 F.3d 41, 52 (2d Cir. 2008); *cf. Hazelwood v. Kuhlmeier*, 484 U.S. 260, 273 (1988) (holding that educators may exercise control over school-sponsored expressive activities "so long as their actions are reasonably related to legitimate pedagogical concerns"). Similarly, in this case B.L.'s post threatened the tenets of teamwork, camaraderie, and positivity that are the hallmarks of scholastic sports, and especially cheerleading.[3]

The connection to this case is even more apparent in the Sixth Circuit decision in *Lowery v. Euverard*, 497 F.3d 584 (6th Cir. 2007). In that case, a group of high school football players were removed from the team after signing a petition expressing their hatred of the coach and their desire not to play for him.

---

[3] In addition to the disruption of the goals of student government, the court in *Doninger* held that the calls and e-mails to the school diverting school officials from other duties could have led school officials to predict possible disruption of school operations. *Id.* at 51. The court noted that it found there was no First Amendment violation based on "the cumulative effect of these findings." *Id.* at 53. The court did not state conclusively whether it would have held the same way in the absence of a potential disruption to school operations; however, the court stated that the fact that the student was only excluded from an extracurricular activity was "of no small significance." *Id.* at 52.

The players lodged a First Amendment claim, and the Sixth Circuit determined that the relevant question under *Tinker* was whether it was reasonable for school officials "to forecast that the petition would disrupt the team," meaning that the petition might foreseeably frustrate efforts to teach the values of sportsmanship and team cohesiveness through participation in sport as an extracurricular activity. *Lowery*, 497 F.3d at 593, 596. The court noted that the players had not been suspended from school or even prevented from further criticizing the coach: "[T]hey are free to continue their campaign to have Euverard fired. What they are not free to do is continue to play football for him while actively working to undermine his authority." *Id.* at 600 (emphases omitted). The court held that there had been no First Amendment violation.

Just as in *Lowery*, B.L.'s dismissal from the cheerleading team did not prevent her from criticizing the cheerleading coaches or her teammates, and it did not affect her educational curriculum or class schedule in any way. It was simply designed to prevent her from participating on the cheerleading team after openly violating team rules and undermining the mission of the team.

The decisions in *Doninger* and *Lowery* make clear that those courts view Tinker's "substantial disruption" standard differently for extracurricular activities than that contemplated for exclusion from regular education. Instead of requiring violence, mayhem, or even the fear of such actions, the Second and Sixth Circuits

held that simply disrupting the regular functioning of an extracurricular activity constitutes a substantial disruption for *Tinker* purposes, whether that takes the form of not living up to the ideals of student government or criticizing a football coach. Under that formulation, B.L.'s actions meet the *Tinker* standard for substantial disruption as she used profanity to express her dissatisfaction with the cheerleading team, violating team rules and upsetting several team members and the coaches.

To accept Appellees' argument that students cannot be disciplined with regard to extracurricular activities absent a severe, substantial disruption would require adult leaders of scholastic sports teams and other extracurricular groups to coach team members every day after school and then potentially have to endure excoriating online criticisms from those same students every night without any recourse. While such a humiliating experience may potentially be necessary in the context of regular education, it surely cannot be required for extracurricular activities that schools are not even required to provide.

### D. *J.S.* and *Layshock* Did Not Address Key Issues That Make This Case Distinguishable

B.L. argues that this Court's reasoning in the cases of *J.S.* and *Layshock* are applicable in this case because all three matters involved off-campus speech. Appellees' Brf., pp. 25-40. However, once again the Appellees fail to consider the unique aspects distinguishing this case from *J.S.* and *Layshock*, primary among

them being that this case centers on a suspension from a voluntary, extracurricular activity.

### 1. *Fraser* should be applied to cases where speech is directed at the school community

Appellees allege that the exception to *Tinker* found in *Bethel Sch. Dist. No. 403 v. Fraser*, 478 U.S. 675 (1986) does not apply to off-campus speech. Appellees' Brf., p. 26. In *J.S.*, this Court stated as such in an 8-6 decision, relying on dicta in *Fredericks v. Morse* that "had Fraser delivered the same speech in a public forum outside the school context, it would have been protected." 551 U.S. 393, 405 (2007) (*citing Cohen*, 403 U.S. 15 (1971)).

However, the *J.S.* court never questioned what the Supreme Court meant by "the school context." Was it referring simply to actions taken inside a school building, or rather looking at the larger picture of speech aimed at a school community? On June 25, 2007 – four days before the first iPhone was released – the U.S. Supreme Court was likely not considering how over the next few years social media would blur the lines of what constitutes on-campus and off-campus speech. Today students can instantly message friends and even a whole student body at any time and from any place.

Four years after *Fredericks*, in a concurring opinion in *Layshock*, Circuit Judge Jordan recognized the difficulty that a bright line between on-campus and off-campus speech creates.

> For better or worse, wireless internet access, smart phones, tablet computers, social networking services like Facebook, and stream-of-consciousness communications via Twitter give an omnipresence to speech that makes any effort to trace First Amendment boundaries along the physical boundaries of a school campus a recipe for serious problems in our public schools.
>
> . . .
>
> I worry that the combination of our decisions today in this case and in *J.S.* may send an "anything goes" signal to students, faculties, and administrators of public schools. To the extent it appears we have undercut the reasoned discretion of administrators to exercise control over the school environment, we will not have served well those affected by the quality of public education, which is to say everyone.

*Layshock*, 650 F.3d at 220-222. Meanwhile, the six judges of this Court dissenting in *J.S.* recognized that the Supreme Court has not spoken clearly on schools' ability to discipline students for off-campus speech:

> The Supreme Court has only briefly and ambiguously considered whether schools have the authority to regulate student off-campus speech. In *Tinker*, the Court stated that "conduct by the student, in class or out of it, which for any reason . . . materially disrupts classwork or involves substantial disorder or invasion of rights of others is, of course, not immunized by constitutional guarantee of freedom of speech." But it is unclear if "in class or out of it" means to distinguish the classroom from the world beyond the schoolhouse gates, or if it simply means out of class but in the cafeteria, schoolyard, or other areas on school grounds. Again, in *Kuhlmeier*, the Court stated that,
>
>> We have ... recognized that the First Amendment rights of students in the public schools are not automatically coextensive with the rights of adults in other settings, and must be applied in light of the special characteristics of the school environment. A school need not tolerate student speech that is inconsistent with its basic educational mission, even though the government could not censor similar speech outside the school.

> But the Court's meaning was left unclear. Either the Court meant to distinguish the school's authority to regulate student speech on campus from the school's authority to regulate off-campus speech, or the Court was simply contrasting the school's authority to regulate student speech with the government's authority to regulate adult speech.

*J.S.*, 650 F.3d at 942-43.

Because of this uncertainty regarding the line between on-campus and off-campus speech, the view taken by several courts when addressing profane language in connection to an extracurricular activity is a reasonable view in determining whether B.L.'s speech in this case deserves *Fraser* analysis.[4]

In *J.S. ex rel. H.S. v. Bethlehem Area School Dist.*, 807 A.2d 847 (Pa. 2002) *abrogated on other grounds as recognized in Commonwealth v. Knox*, 190 A.3d 1146 (Pa. 2018), a middle school student created a web site titled "Teacher Sux,"

---

[4] In a footnote, B.L.'s counsel accused the School District of "misleadingly" suggesting that the Ninth Circuit's decision in *Chandler v. McMinnville School Dist.*, 978 F.2d 524 (9th Cir. 1992) stands for "the proposition that Fraser applies 'without a showing that such speech occurred during a school-sponsored event.'" Appellees' Brf., pp. 26-27, n.6. The accusation is off the mark. First, it is questionable how Appellees could challenge a direct quote taken from the *Chandler* decision in which the court clearly expressed its opinion on the *Fraser* exception by stating, "[S]chool officials may suppress speech that is vulgar, lewd, obscene, or plainly offensive without a showing that such speech occurred during a school-sponsored event or threatened to 'substantially interfere with [the school's] work.'" *See* Appellant's Brf., p. 24 (*quoting Chandler*, 978 F. 2d at 529 (*quoting Tinker*, 393 U.S. at 509)). To the extent that the Appellees' complaint is simply that the facts of the *Chandler* case did not involve off-campus speech and the court was able to avoid the application of *Fraser*, the School District concurs, but notes that it never argued otherwise.

that included crude and derogatory comments about teachers and the school's principal. The school district eventually expelled the student, whose parents then appealed. The Supreme Court began its analysis by recognizing other cases where "off-campus speech has been imported onto school grounds."[5] *Id.* at 865. The court then held that although the web site was created off school property, the speech constituted on-campus speech because it was directed toward the school community and was accessible on school property. "The statements made in the 'Teacher Sux' web site are no less lewd, vulgar or plainly offensive than the speech expressed at the school assembly and held subject to discipline in *Fraser*." *Id.* at 868 (applying both *Tinker* and *Fraser* analysis). In this case, B.L.'s Snaps were clearly directed at a specific audience of MAHS students and were capable of being accessed by students on their cell phones while on school property and were

---

5 *See Baker v. Downey City Board of Educ.*, 307 F. Supp. 517, 526 (C.D. Cal. 1969) (distribution of underground paper outside gate of campus did not militate against fact that student knew other students would distribute paper on campus); *Boucher v. School District of Greenfield*, 134 F.3d 821, 828-29 (7th Cir. 1998) (student expression case law applies to underground newspaper distributed on campus); *Bystrom v. Fridley High School*, 686 F. Supp. 1387 (D. Minn. 1987) (student expression case law applies where unofficial newspaper distributed in lunch room); *Pangle v. Bend–Lapine School Dist.*, 10 P.3d 275 (Ore. 2000) (same, where on campus distribution of underground newspaper); *cf., Fenton v. Stear*, 423 F. Supp. 767, 772 (W.D. Pa. 1976) (calling a teacher a lewd name in a public place subjected student to discipline by school authorities); *but see Thomas v. Bd. of Educ., Granville Central School District*, 607 F.2d 1043, 1050 (2d Cir.1979) (school activity *de minimis* where publication printed outside school and not sold on school grounds, but few articles transcribed on school typewriters and finished product stored in teacher's closet).

admittedly profane. Further, they found their way into the school and into the hands of the coaches.

In *Kowalski v. Berkeley County Schools*, 652 F.3d 565 (4th Cir. 2011), a high school cheerleader created a MySpace group web page making derisive comments about a classmate, and she invited 100 friends to join the group. 652 F.3d at 567-68. The next day, the parents of the offended classmate complained to the school. Administrators concluded that Kowalski had created a "hate website" in violation of school policy. They suspended her from school for five days and issued a 90-day "social suspension," preventing her from attending school events. Kowalski was also removed from the cheerleading squad. Kowalski challenged the discipline on the grounds that the speech occurred off campus. The Fourth Circuit held that there was enough of a nexus to the school community to discipline her:

> Kowalski indeed pushed her computer's keys in her home, but she knew that the electronic response would be, as it in fact was, published beyond her home and could reasonably be expected to reach the school or impact the school environment. She also knew that the dialogue would and did take place among Musselman High School students whom she invited to join the "S.A.S.H." group and that the fallout from her conduct and the speech within the group would be felt in the school itself. . . . There is surely a limit to the scope of a high school's interest in the order, safety, and well-being of its students when the speech at issue originates outside the schoolhouse gate. But we need not fully define that limit here, as we are satisfied that the nexus of Kowalski's speech to Musselman High School's pedagogical interests was sufficiently strong to justify the action taken by school

> officials in carrying out their role as the trustees of the student body's well-being.

*Id.* at 573. The *Kowalski* court held that it could likely decide the case on *Fraser* grounds, but that such a decision was unnecessary since the school's discipline of Kowalski was permitted under *Tinker*. *Id.* at 573.

The *Kowalski* case bears a striking resemblance to the facts in the instant case. Although B.L. did not direct her Snap at a specific classmate, she gave the middle finger and made comments hurtful to the cheerleading team in general. As in *Kowalski,* B.L. knew that her posts could reasonably be expected to impact the school environment. B.L. also knew, or should have known, that her post would generate dialogue among her MAHS classmates who viewed the posts, and that the posts would echo in the school itself, as they certainly did.

The *J.L. ex rel. H.S.* and *Kowalski* cases demonstrate that *Fraser* analysis can and should be applied when off-campus speech can be deemed to constitute on-campus speech, as in this case. Thus the discipline of B.L. was permitted under *Fraser*.

**2. Appellees' Analysis of *Tinker* Exceptions is Incorrect**

Appellees claim that there is no exception to *Tinker* permitting schools to "punish speech whenever the punishment advances a school's 'educational mission.'" Appellees' Brf., p. 28. However, as noted above (*see* Section I.C., *supra*), no exception to *Tinker* is required because *Tinker* – as properly interpreted

by the Second and Sixth Circuits – permits regulation of speech where the discipline is related to extracurricular activities. Therefore, there is no need to "recognize a new exception to the student speech doctrine," as Appellees allege (Appellees' Brf., p. 28), in order to find in the School District's favor. And even if an exception were required, the *Fraser* exception should apply. *See* Section I.D.1, *supra*.

**3. This Court must determine the extent of students' First Amendment rights**

It is undisputed that students do not enjoy the full First Amendment protections available to citizens at large. This case posits the question of exactly how those two sets of rights differ. Accordingly, in examining this issue, the School District has analogized that the relationship between a school and a student representing the school by participating in an extracurricular sport is similar to that between a government agency and its employees. *See* Appellant's Brf., pp. 27-30. B.L.'s counsel criticizes this analogy, claiming there is "no authority for the proposition." Appellees' Brf., pp. 34-35. However, because students in extracurricular activities are representing their school to the community, the comparison is apropos. Because this Court has not previously addressed the issue of the First Amendment protections of off-campus speech resulting in discipline aimed at extracurricular activities, the government agency/employee model offers a valid comparator for determining the extent of students' First Amendment rights.

Regardless of whether the government model is accepted, it is important to recognize that the Court is not bound by the decisions in *J.S.* and *Layshock*, which did not address cases in which a student was merely excluded from an extracurricular activity. Indeed, the Court is free to heed the warnings of the dissenters in *J.S.* (650 F.3d at 941-51) and the concurrence in *Layshock* (650 F.3d at 219-22) that the Court was "underestimating the impact"[6] of the "vulgar, obscene, malicious, or harmful" comments of students and that by "undercut[ting] the reasoned discretion of administrators to exercise control over the school environment, we will not have served well those affected by the quality of public education, which is to say everyone. "[7]

### 4. Appellees fail to distinguish similar factual case of *Johnson v. Cache County School District*

B.L.' counsel next argues that "the [sixty-five] cases MASD relies on are ***all*** distinguishable." Appellees' Brf., p. 35 (emphasis added). They then go on to challenge a few specific cases cited in the Appellant's Brief, including *Johnson v. Cache County School Dist.*, 323 F. Supp. 3d 1301 (D. Utah 2018). In that case, candidates who made the cheerleading team were asked to keep the results quiet for 24 hours until the coach could announce the results. Therefore, the facts of

---

6 *J.S.*, 650 F.3d at 943.

7 *Layshock*, 650 F.3d at 222.

two cases are extremely similar with the exception that the cheerleaders in *Johnson* were asked not to communicate a very specific message.

Appellees claim that *Johnson* is distinguishable is because "B.L. did not involve a specific situation where students were asked by a coach and school officials not to post a certain message for a limited period of time." Appellees' Brief, pp. 37-38. This argument is not credible because B.L. has argued from the beginning that her "off-campus speech" is completely protected, not that it can be stifled as long as the prohibited speech is specifically defined. Meanwhile, it is also clear that the Mahanoy Area cheerleaders – including B.L. – were given copies of the Cheerleading Rules specifically outlining what types of negative language would be deemed improper, and therefore were aware of what was specifically prohibited.

**E. The Cheerleading Rules Are Not Unconstitutional**

B.L.'s final argument is that the MAHS Cheerleading Rules are "facially unconstitutional because they are viewpoint discriminatory."[8] Appellees' Brf., pp. 46-48. Appellees allege that the Rules are improper because they allow cheerleaders to express respectful comments, but not disrespectful ones." However, this is plainly incorrect as determined by B.L.'s own claims. In the

---

[8] The district court declined to address this alternate argument alleging that the Cheerleading Rules are unconstitutional. J.A. 24-25.

"Facts" section of Appellees' brief, they acknowledge that "respect provision"[9] of the Cheerleading Rules, for which B.L. was disciplined, prohibits the use of profanity regardless of viewpoint.

> The coaches determine what is "respectful" on a "case by case basis" based on how the coaches "feel." JA170-71. The coaches believe that any use of profanity in a statement about cheerleading – such as "fuck cheer" or "cheerleading is fucking awesome" – violates the "respect" rule even if the statement expresses approval of cheerleading. JA196.

Appellees' Brf., pp. 4-5. Accordingly, because Appellees recognize that the cheerleading coaches would have punished B.L. for profanity regardless of whether her statement was positive or negative, there can be no viewpoint discrimination, and the Cheerleading Rules are not unconstitutional.

### F. Addressing Arguments of Amicus Curiae Foundation for Individual Rights in Education

The Foundation for Individual Rights in Education ("FIRE") filed an amicus curiae brief in this matter on August 28, 2019 (the "Fire Brief"). The School District hereby addresses issues raised in the FIRE brief.

#### 1. The Unconditional Conditions Doctrine is Inapposite

FIRE's first and primary argument is that "a public entity cannot demand the surrender of a constitutional right as a condition of receiving a public benefit." See

---

[9] The "respect provision" states, "Please have respect for your school, coaches, teachers, other cheerleaders and teams. Remember, you are representing your school when at games, fundraisers, and other events. Good sportsmanship will be enforced, this includes foul language and inappropriate gestures." J.A. 439.

FIRE Brf., p. 5 (*citing Fraternal Order of Police, Lodge No. 5 v. City of Phila.*, 812 F.2d 105, 112 (3d Cir. 1987)). FIRE alleges that the School District conditioned B.L.'s membership on the Cheerleading Team with B.L. relinquishing her First Amendment rights. Fire Brf., pp. 5-11.

FIRE's argument fails because, as described throughout this Reply Brief, the School District claims that the decision to suspend B.L. from the cheerleading team was proper under *Tinker* and/or *Fraser* and therefore did not require B.L. to give up any constitutional right.

### 2. School District's arguments do not threaten students' First Amendment rights online

FIRE next claims that the School District is arguing for the power to "censor any disfavored student speech in exchange for the ability to participate in extracurricular activities." FIRE Brf., p. 19. FIRE alleges that students will face increasing amounts of monitoring if this Court rules in favor of the School District because a finding in the School District's favor would lead to an atmosphere where students are deemed to be "on campus" at all times. *Id.*, pp. 19-23.

FIRE's argument is belied by the fact that the School District is not arguing for the authority to discipline students for any off-campus speech. Rather, the School District merely argues that it should be permitted to discipline B.L. for posting a profane message and gesture and directing them at the school community by sending the Snap to numerous students and addressing school-related issues.

So even if the School District is ultimately successful in this case, there would be no extension of School District censorship as most off-campus speech would remain beyond the School District's authority to control.

### G. Addressing Arguments of Additional Amici

An amicus curiae brief was submitted in this matter on August 28, 2019 by the Electronic Frontier Foundation, the Student Press Law Center, the Pennsylvania Center for the First Amendment, and the Brechner Center for Freedom of Information (together the "Amici"). The School District hereby addresses issues raised in the brief (the "Amici Brief").

#### 1. *Tinker* Must Apply to Off-Campus Speech

The Amici urge this Court to find that the substantial disruption test of *Tinker* does not apply to off-campus speech. Amici Brf., pp. 4-8. They do so unconvincingly by citing to First Amendment cases that are inapposite because they did not involve allegations of substantial disruption or even a foreseeable potential for substantial disruption.

While this Court and the Supreme Court have not held that *Tinker* specifically applies to off-campus speech,[10] other courts have done so. *Wisniewski v. Bd. of Educ. of the Weedsport Cent. Sch. Dist.*, 494 F.3d 34, 39 & n.4 (2d Cir.2007); *J.C. ex rel. R.C. v. Beverly Hills Unified Sch. Dist.*, 711 F. Supp. 2d

---

[10] In *J.S.*, the majority assumed without deciding that *Tinker* applied to the student speech in that case. *J.S.*, 650 F.3d at 926.

1094, 1104, 1107 (C.D. Cal. 2010); *Killion v. Franklin Reg'l Sch. Dist.*, 136 F. Supp. 2d 446, 454-55 (W.D. Pa. 2001). In *Layshock*, this Court seemed to agree, saying in dicta:

> We believe the cases relied upon by the School District stand for nothing more than the rather unremarkable proposition that schools may punish expressive conduct that occurs outside of school, as if it occurred inside the "schoolhouse gate," under certain very limited circumstances, none of which are present here.

*Layshock*, 650 F.3d at 219.

The Amici claim that *Tinker* should not be applied to off-campus speech because off-campus social media use is so prevalent today that off-campus speech can too easily find its way onto campus and potentially subject its author to allegations of impropriety. Amici Brf., pp. 9-21. However, this argument is misplaced. Under a *Tinker* analysis, simply because the speech finds its way onto campus would not subject the speaker to discipline unless the speech created a reasonable potential for substantial disruption. As such, simple criticism of school officials by students would normally be fully protected, just as the students' armband protests were permitted in *Tinker*.

However, if this Court were to agree with the Amici and hold that *Tinker* does not apply to off-campus speech – presumably defined as speech created when the speaker was not physically on school property – schools would be helpless against a sea of online attacks, including possibly even threats of violence and

terrorism. Tying the hands of school administrators would certainly create many more problems than would arise by regularly applying Tinker analysis.

## II. CONCLUSION

In view of the foregoing, it is respectfully requested that the decision of the Court below be reversed.

Respectfully submitted,

Date: September 11, 2019

*/s/ David W. Brown*

Michael I. Levin (PA 21232)
David W. Brown (PA 201553)

LEVIN LEGAL GROUP, P.C.
1800 Byberry Road, Suite 1301
Huntingdon Valley, PA 19006
Phone: (215) 938-6378
mlevin@levinlegalgroup.com
dbrown@levinlegalgroup.com

*Attorneys for Appellant*

**UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT**

| | | |
|---|---|---|
| B.L., a minor, by her father, LAWRENCE LEVY, and her mother, BETTY LOU LEVY | : | No. 19-1842 |
| *Appellees*, | : | |
| v. | : | |
| MAHANOY AREA SCHOOL DISTRICT, | : | On appeal from the U.S. District Court for the Middle District of Pennsylvania |
| *Appellant*. | : | |

**CERTIFICATE OF COMPLIANCE**

1. This document complies with the word limit of Fed. R. App. P. 32(a)(7)(B) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 5,767 words.

2. This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman.

Date: September 11, 2019

*/s/ David W. Brown*
David W. Brown

**UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT**

| | |
|---|---|
| B.L., a minor, by her father, LAWRENCE LEVY, and her mother, BETTY LOU LEVY | No. 19-1842 |
| *Appellees*, | |
| v. | |
| MAHANOY AREA SCHOOL DISTRICT, | On appeal from the U.S. District Court for the Middle District of Pennsylvania |
| *Appellant*. | |

**CERTIFICATE OF BAR MEMBERSHIP**

Pursuant to L.A.R. 28.3(d), I hereby certify that the attorneys for the Appellant – Michael I. Levin and David W. Brown – are members of the bar of the U.S. Court of Appeals for the Third Circuit.

Date: September 11, 2019

*/s/ David W. Brown*
David W. Brown

**UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT**

| | | |
|---|---|---|
| B.L., a minor, by her father, LAWRENCE LEVY, and her mother, BETTY LOU LEVY | : | No. 19-1842 |
| *Appellees*, | : | |
| v. | : | |
| MAHANOY AREA SCHOOL DISTRICT, | : | On appeal from the U.S. District Court for the Middle District of Pennsylvania |
| *Appellant*. | : | |

**CERTIFICATE OF SERVICE**

I hereby certify that on this 11th day of September, 2019, I electronically re-transmitted the foregoing Reply Brief of Appellant to be filed to the Clerk's Office using the Court's Electronic Case Filing system ("ECF") for filing and transmittal of a Notice of Electronic Case Filing to Appellants' counsel at the following addresses in accordance with Fed. R. App. P. 25(a)(2)(D) and L.A.R. 25.1.

**Molly Tack-Hooper**
**Mary Catherine Roper**
AMERICAN CIVIL LIBERTIES
UNION OF PENNSYLVANIA
P.O. Box 60173
Philadelphia, PA 19102

*Attorneys for Appellees*

**Arleigh Helfer**
**Terry Loscalzo**
SCHNADER HARRISON
SEGAL & LEWIS LLP
1600 Market Street, Suite 3600
Philadelphia, PA 19103

*Attorneys for Appellees*

*/s/ David W. Brown*
David W. Brown

**UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT**

| | |
|---|---|
| B.L., a minor, by her father, LAWRENCE LEVY, and her mother, BETTY LOU LEVY | : No. 19-1842 |
| *Appellees*, | |
| v. | |
| MAHANOY AREA SCHOOL DISTRICT, | : On appeal from the U.S. District Court for the Middle District of Pennsylvania |
| *Appellant*. | |

**CERTIFICATE OF IDENTICAL COMPLIANCE OF BRIEFS**

Pursuant to L.A.R. 31.1(c), I hereby certify that this Reply Brief of Appellant is being filed with the Court in both electronic and paper form, and that the text of the electronic brief is identical to the text in the paper copies.

Date: September 11, 2019

*/s/ David W. Brown*
David W. Brown

**UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT**

| | |
|---|---|
| B.L., a minor, by her father, LAWRENCE LEVY, and her mother, BETTY LOU LEVY | No. 19-1842 |
| *Appellees*, | |
| v. | |
| MAHANOY AREA SCHOOL DISTRICT, | On appeal from the U.S. District Court for the Middle District of Pennsylvania |
| *Appellant*. | |

**CERTIFICATE OF ANTI-VIRUS DETECTION PROGRAM USE**

Pursuant to L.A.R. 31.1(c), I hereby certify that a computer virus detection program had been run on the electronic version of this Reply Brief of Appellant, and that no virus was detected. The virus detection program utilized was Symantec.cloud – Endpoint Protection, NIS-22.8.0.50 / Symantec.cloud – Cloud Agent 3.00.10.2737.

Date: September 11, 2019

*/s/ David W. Brown*
David W. Brown